## EDMUND JACKSON *vs.* WENDELL PHILLIPS & others.

The attorney general should be made a party to a bill by an executor for instructions as to the validity of a bequest to trustees appointed by the will for a charitable purpose.

Bequests to trustees for charitable purposes are not within the common rule against perpetuities, and may leave the mode of application and the selection of the particular objects to the discretion of the trustees.

A bequest for the purpose of procuring a change in the laws is not a charity.

A charity is a gift, to be applied, consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds and hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government.

A charitable bequest which, consistently with the intention of the testator as manifested in the will, can be applied in a lawful manner, will be upheld; but if the words are broad enough to cover an illegal as well as a legal application, and the trustees to whom it is given are not a corporation established by law, this court, upon a bill in equity by the executor for instructions as to the disposition of the bequest, will

refer the case to a master in chancery to frame a scheme for its application in a lawful manner according to the intent of the testator, before ordering it to be paid to the trustees.

A bequest to trustees, to be expended at their discretion, " in such sums, at such times and such places, as they deem best, for the preparation and circulation of books, newspapers, the delivery of speeches, lectures and such other means as in their judgment will create a public sentiment that will put an end to negro slavery in this country," was a legal charity before slavery was abolished in the United States.

A bequest to trustees, to be expended at their discretion " for the benefit of fugitive slaves who may escape from the slaveholding states of this infamous Union from time to time," might, before slavery was abolished in the United States, be lawfully applied, consistently with the expressed intention of the testator, to the relief of fugitive slaves in distress, or the extinguishment by purchase of the claims of those alleging themselves to be their masters, and was a legal charity.

A bequest to trustees, " to secure the passage of laws granting women, whether married or unmarried, the right to vote, to hold office, to hold, manage and devise property, and all other civil rights enjoyed by men," is not a charity.

In a bequest in trust to pay the income to a son or daughter of the testator for life, and at his or her death to his or her children for life, and upon their death, if they survive their parent, or upon his or her death, in case they should die first, then over, the gift over is not void for remoteness if the son or daughter in fact dies leaving no children surviving.

When a valid bequest to trustees for charitable purposes described in the will cannot, by reason of a change of circumstances after the testator's death, be carried out according to his directions, this court has jurisdiction in equity to order it to be executed as nearly as possible according to his expressed intent.

A testator, residing in Boston, bequeathed two sums to trustees; one " for the preparation and circulation of books, newspapers, the delivery of speeches, lectures and such other means as in their judgment will create a public sentiment that will put an end to negro slavery in this country ; " and the other " for the benefit of fugitive slaves who may escape from the slaveholding states; " and expressed his desire that the trustees should become a permanent organization, and his hope and trust that they would receive the services and sympathy, the donations and bequests of the friends of the slave. After his death, slavery was abolished by the thirteenth amendment of the Constitution of the United States. Held, upon a bill in equity by the executor for instructions, that these charitable bequests were not thereby terminated or destroyed, but were to be applied to carry out in a lawful manner the intentions of the testator as nearly as possible, according to a scheme to be settled by a master in chancery and approved by the court, before the funds were paid over to the trustees; and, upon the return of the master's report, that both sums should be paid over to the trustees, the first to be paid by them from time to time to an association already established, to promote the education, support and interests of the freedmen, lately slaves, in those states in which slavery had been so abolished, to be expended for that object; and the second sum (being of small amount) to the use of necessitous persons of African descent in the city of Boston and its vicinity, preference being given to such as had escaped from slavery·

BILL IN EQUITY by the executor of the will of Francis Jackson, of Boston, (who died in 1861,) for instructions as to the validity and effect of the following bequests and devises :

" *Article 4th.* I give and bequeath to William Lloyd

Garrison, Wendell Phillips, Edmund Quincy, Maria W. Chap-
man, L. Maria Child, Edmund Jackson, William I. Bowditch,
Samuel May, Jr., and Charles K. Whipple, their successors and
assigns, ten thousand dollars; not for their own use, but in
trust, nevertheless, for them to use and expend at their discre-
tion, without any responsibility to any one, in such sums, at
such times and such places, as they deem best, for the prep-
aration and circulation of books, newspapers, the delivery of
speeches, lectures, and such other means, as, in their judgment,
will create a public sentiment that will put an end to negro
slavery in this country; and I hereby constitute them a board
of trustees for that purpose, with power to fill all vacancies
that may occur from time to time by death or resignation of any
member or of any officer of said board. And I hereby appoint
Wendell Phillips president, Edmund Jackson treasurer, and
Charles K. Whipple secretary, of said board of trustees. Other
bequests, hereinafter made, will sooner or later revert to this
board of trustees. My desire is that they may become a per-
manent organization; and I hope and trust that they will
receive the services and sympathy, the donations and bequests,
of the friends of the slave.

"*Article 5th.* I give and bequeath to the board of trustees
named in the fourth article of this will, their successors and
assigns, two thousand dollars, not for their own use, but in
trust, nevertheless, to be expended by them at their discretion,
without any responsibility to any one, for the benefit of fugitive
slaves who may escape from the slaveholding states of this
infamous Union from time to time.

" Disregarding the self-evident declaration of 1776, repeated
in her own constitution of 1780, that ' all men are born free and
equal,' Massachusetts has since, in the face of those solemn
declarations, deliberately entered into a conspiracy with other
states to aid them in enslaving millions of innocent persons. I
have long labored to help my native state out of her deep in-
iquity and her barefaced hypocrisy in this matter. I now enter
my last protest against her inconsistency, her injustice, and her
cruelty, towards an unoffending people. God save the fugitive

slaves that escape to her borders, whatever may become of the Commonwealth of Massachusetts!

"*Article 6th.* I give and bequeath to Wendell Phillips of said Boston, Lucy Stone, formerly of Brookfield, Mass., now the wife of Henry Blackwell of New York, and Susan B. Anthony of Rochester, N. Y., their successors and assigns, five thousand dollars, not for their own use, but in trust, nevertheless, to be expended by them, without any responsibility to any one, at their discretion, in such sums, at such times, and in such places, as they may deem fit, to secure the passage of laws granting women, whether married or unmarried, the right to vote; to hold office; to hold, manage, and devise property; and all other civil rights enjoyed by men; and for the preparation and circulation of books, the delivery of lectures, and such other means as they may judge best; and I hereby constitute them a board of trustees for that intent and purpose, with power to add two other persons to said board if they deem it expedient. And I hereby appoint Wendell Phillips president and treasurer, and Susan B. Anthony secretary, of said board. I direct the treasurer of said board not to loan any part of said bequest, but to invest, and, if need be, sell and re-invest, the same in bank or railroad shares, at his discretion. I further authorize and request said board of trustees, the survivors and survivor of them, to fill any and all vacancies that may occur from time to time by death or resignation of any member or of any officer of said board. One other bequest, hereinafter made, will, sooner or later, revert to this board of trustees. My desire is that they may become a permanent organization, until the rights of women shall be established equal with those of men; and I hope and trust that said board will receive the services and sympathy, the donations and bequests, of the friends of human rights. And being desirous that said board should have the immediate benefit of said bequest, without waiting for my exit, I have already paid it in advance and in full to said Phillips, the treasurer of said board, whose receipt therefor is on my files.

"*Article 8th.* I now give to my three children equally the net income of the residue of my estate, during the term of their

natural lives, in the following manner, namely: After the payment of my debts and the foregoing gifts and bequests, I give, bequeath and devise one undivided third part of the residue of my estate, real, personal and mixed, to my brother Edmund Jackson of said Boston, his successors and assigns, not for his or their own use, but in trust, nevertheless, with full power to manage, sell and convey, invest and re-invest, the same at his discretion, with a view to safety and profit;" and " the whole net income thereof shall be paid semi-annually to my daughter Eliza F. Eddy, during her natural life;" and at her decease, one-half of such income to be paid semi-annually " to the board of trustees constituted in the sixth article of this will, to be expended by them to promote the intent and purpose therein directed," and the other half to Lizzie F. Bacon, her daughter, during her natural life; and at the decease of both mother and daughter, " to pay and convey the whole of said trust fund to said board of trustees constituted in the sixth article of this will, to be expended by them in the manner, and for the intent and purpose, therein directed."

By *Article 9th,* the testator gave another undivided third part of the said residue to his brother Edmund, his successors and assigns, in trust, with like powers of management and investment, " and the whole net income thereof shall be paid semi-annually to my son James Jackson, during the term of his natural life; at his decease, I direct said trustee, or whoever may then be duly qualified to execute this trust, to pay semi-annually one-half part of the net income thereof to the board of trustees constituted in the fourth article of this will, and the other half-part of said net income shall be paid semi-annually to his children equally, during their natural lives; at the decease of all his children, if they survive him, I direct said trustee, or whoever shall then be duly authorized to execute this trust, to pay and convey the whole of said trust fund to said board of trustees constituted in said fourth article in this will, to be expended by them for the intent and purpose directed in said fourth article; but, in case my said son James should leave no child living at the time of his decease, then, at his decease, I direct said trustee, or whoever shall then be duly authorized to

execute this trust, to pay and convey the whole of said trust fund to said board of trustees constituted in the fourth article of this will, to be expended by them for the intent and purpose therein directed."

By *Article* 10*th*, the testator made a similar bequest and devise of the remaining undivided third part of said residue to his brother George Jackson, his successors and assigns, and in trust to pay the whole net income thereof semi-annually to the testator's daughter Harriette M. Palmer, during her natural life, and at her decease, one half of such income " to the board of trustees constituted in the fourth article of this will, to be expended by them in the manner and for the intent and purpose therein directed ;" and the other half, in equal proportions, to all her children that may survive her, during the term of their natural lives ; and, at their decease, to pay and convey the whole of said trust fund to said board of trustees ; " but, in case my said daughter Harriette M. Palmer should outlive all her children, then, at her decease, I direct said trustee, or whoever shall then be duly authorized to execute this trust, to pay and convey the whole of said trust fund to the board of trustees constituted in said fourth article in this will, to be expended by them as aforesaid."

The bill, after setting out the above provisions of the will, alleged that James Jackson was unmarried and had no issue living, and that Harriette M. Palmer was married and had two children living ; and made all the trustees named in the will, as well as James Jackson, Mrs. Eddy, Mrs. Bacon, and Mrs. Palmer and her husband and children, parties to the bill.

Answers were filed in behalf of the trustees named in the fourth article, asserting the validity of all the gifts to them ; and in behalf of Mr. and Mrs. Palmer and their children, denying the validity of all the articles above set forth. The bill was taken for confessed against the other defendants.

One argument was had in March 1863, after which the court ordered the attorney general to be made a party, which was done, and he submitted the case without argument, and a second argument by the other counsel was had in November 1865. While the case was under advisement, the thirteenth

article of amendment of the Constitution of the United States was adopted, and the effect of this amendment upon the case was argued in March 1866.*

*S. E. Sewall,* for one of the trustees.   The legacy designed to promote the abolition of slavery is valid.   The trustees are named and capable of taking.   The object is specific and definite.   The means proposed are definite and legal.   The object is good and consonant to public policy.   The jurisdiction of chancery over charitable trusts is not derived from *St.* 43 Eliz. *c.* 4.   But in this case the bequest comes within that statute, being for the relief or redemption of prisoners or captives. Objects held charitable by analogy to those enumerated in that statute are very numerous.   Thus, a life-boat for a town, *Johnston* v. *Swann,* 3 Madd. Ch. R. 457; a botanical garden, *Townley* v. *Bedwell,* 6 Ves. 194; society for encouragement of female servants, *Reeve* v. *Attorney General,* 3 Hare, 191; benefit and advantage of Great Britain, *Nightingale* v. *Goulburn,* 5 Hare, 484; good of the country and parish, *Attorney General* v. *Lonsdale,* 1 Sim. 105; British Museum, *British Museum* v. *White,* 2 Sim. & Stu. 594; assistance of respectable Unitarian congregations, *Shrewsbury* v. *Hornby,* 5 Hare, 406; a literary man, preferably not less than forty years of age, *Thompson* v. *Thompson,* 1 Colly. R. 381; essays on statistics, *Ib.* 392, 399; shade trees, *Cresson's Appeal,* 30 Penn. State R. 437; Masonic Lodge, *Vander Volgen* v. *Yates,* 3 Barb. Ch. R. 242; Universalist denomination, *North Adams Universalist Soc.* v. *Fitch,* 8 Gray, 421.

The legacy for the benefit of fugitive slaves is also valid. Under this head, the testator no doubt intended all who are liable to be claimed as such, and may need assistance.   This would include colored persons born free; colored persons originally slaves but who have acquired their freedom pursuant to the laws of the state of their origin; colored persons, originally

---

\* The first argument was before BIGELOW, C. J., DEWEY, METCALF, MERRICK and HOAR, JJ., and the second and third arguments before BIGELOW, C. J., DEWEY, HOAR, CHAPMAN and GRAY, JJ.

Many cases, cited in the opinion, and also cited at the bar, are omitted in these brief sketches of the arguments.

slaves, who by coming into a free state with their master's con-
sent have become free; slaves claimed by strangers without
authority from the owners; and slaves claimed by their owners
without due formality. To aid all such is not only legal, but
it is aiding the policy of our statutes. *Res.* 1855, *c.* 26. Gen.
Sts. *c.* 144, §§ 58–67.

The provisions to aid women are also valid. Our laws have
already greatly modified the common law, in favor of women.
It is true that to give them the elective franchise would require
a change of the constitution. But that is no objection to dis-
cussing the subject. The constitution only differs from statutes
in this, that its provisions are not so easily altered. The policy
of its provisions is always fair matter of discussion. And as to
this great public question, it will promote the truth to have it
discussed.

The legacy for promoting the abolition of slavery, and for the
benefit of fugitive slaves, may be administered *cy pres.* The
doctrine is fully established in England, that where the specific
object of a charity fails, the court will execute the general intent
of the donor. *Attorney General* v. *Llandaff,* cited in 2 Myl. &
K. 658. *Attorney General* v. *Andrew,* 3 Ves. 639. *Andrew* v.
*Merchant Taylors' Co.* 7 Ves. 223. *Andrew* v. *Trinity Hall,* 9
Ves. 525. *Hayter* v. *Trego,* 5 Russ. 113. *Attorney General* v.
*Wansay,* 15 Ves. 231. *Mills* v. *Farmer,* 1 Meriv. 55, 98. See
also *Nourse* v. *Merriam,* 8 Cush. 11, 21. 2 Story on Eq. §§
1167–1181.

[The argument as to perpetuities is omitted.]

*G. W. Phillips,* for others of the trustees. [This argument
only dealt with the question as to perpetuities.]

*S. Bartlett & J. G. King,* for certain heirs at law. The great
and fundamental question is, Can these trusts be regarded as
public charities? The question what is or is not a public
charity depends on the St. of Eliz. and the series of decisions
under it. It is not the fact that the purpose of a grant is an
object of benevolence or the highest humanity, which brings it
within that statute; many such cases have been excluded
because not within its words or settled analogies. If the court

is to go into fields of speculation beyond, then the conscience or opinion of each judge must be addressed. It is said that the jurisdiction over charities is not derived from that statute. This is true. The jurisdiction existed before, but the objects of that jurisdiction are defined there. To say that the jurisdiction existed before does not advance the argument.

The trust to create a public sentiment which will put an end to negro slavery in this country cannot be held to be a valid trust for public charity. *First,* Because such a trust must be either within the words of the St. of Eliz., or within the analogies as settled by the course of judicial decisions, and a trust to create a sentiment of any kind cannot be deemed to be within the statute or its analogies. No case has been found where such a trust has been sustained. *Secondly,* Such a trust would, having regard to the constitution and laws under which we live, be against public policy, and thus be void. *Thirdly,* Looking to the means which the testator required to be employed, the only possible mode of executing the purpose tends to servile insurrection or civil dissension, and is thus repugnant to public policy. *Fourthly,* This particular trust could never have been within the purview of the St. of Eliz., since during that reign the slave trade was fostered and rewarded. *Fifthly,* The uncertainty of the means pointed out to execute the trust were such that its execution could not be enforced or controlled by a court of equity, and consequently upon settled principles the trust is void. *Ommanney* v. *Butcher,* 1 Turn. & Russ. 260. *Williams* v. *Kershaw,* 1 Keen, 275. *Vezey* v. *Jamson,* 1 Sim. & Stu. 69. *Ellis* v. *Selby,* 7 Sim. 352. *Kendall* v. *Granger,* 5 Beav. 300.

If the execution of a trust would have a tendency to disturb our relations with a friendly power, the trust will be held void. Looking at the present will, and gathering from it the purpose and disposition of the testator, this trust cannot stand if it be clear that the means to be used are repugnant to the policy of the law   If this trust is executed in the spirit of its founder, is not the result clear? The laws and political institutions have provided for the continuance of slavery, whether right or wrong — though wrong, of course — and the question is, whether a trust to alter those institutions is a public charity.

The bequest of a fund to be expended for the benefit of fugitive slaves is to effect an object repugnant to our constitution and laws; and, if otherwise, its mode of execution is too vague to be carried into effect by a court of equity. The escape of fugitive slaves is illegal, and harboring such fugitives with knowledge of the fact is made penal. U. S. St. 1793, *c.* 7, § 4. The tendency of any aid to such fugitives is to encourage the violation of law, and therefore this trust cannot be sustained. Looking at the will, it cannot be doubted that such was the intent of the testator.

The trust for securing the passage of laws granting certain additional rights to women is open to the same objection already urged, and has the additional feature that the thing sought to be obtained cannot be accomplished by procuring "the passage of laws." See *Hope* v. *Hope*, 26 Law Journ. (N. S.) Ch. 417, 424. No authority has been cited which would bring this trust within the St. of Eliz. A bequest to bring about a state of public opinion which would change the whole form of existing government could not but be held void. But in this case, "the passage of laws" such as are contemplated is prohibited by the constitution. Can this court declare that to be a great purpose of public utility, which assails the institutions under which we live?

The question as to the power of the court to execute these trusts *cy pres* remains. The argument begins with a strong presumption against this doctrine because its administration in England has been notorious for centuries; but by the supreme court of the United States it has been rejected, and it has been administered, as it is believed, in no reported case of authority by the courts of any state. For a century, its existence has been apologized for and lamented by the English courts, and in most American courts it is denied and repudiated.

Even under the modern English decisions, the doctrine is not applicable to this case. Where there is no general expression of a charitable intention, but only a specific devise to a particular object, the doctrine of *cy pres* is not applied. The object of putting an end to negro slavery in the United States

was a particular object. It was not to educate, feed, clothe or transport slaves; but to free them. That object being accomplished, the whole object of the testator is fulfilled. See *Cherry* v. *Mott*, 1 Myl. & Cr. 129; *Clark* v. *Taylor*, 1 Drewry, 644; *Russell* v. *Kellett*, 3 Smale & Gif. 258; *Attorney General* v. *Minshull*, 4 Ves. 14; *Easterbrooks* v. *Tillinghast*, 5 Gray, 17.

In modern cases the English courts have only applied this doctrine in cases like those above referred to; or where the substance of the bequest can be carried out, though the details are varied; or where there is a surplus after fulfilling the literal directions of the bequest, and it is accordingly applied to similar objects; or where several objects of charity are provided for in the same will, and some fail, and an intention that in such event the whole fund shall be applied to the others can be gathered from the will.

The whole doctrine has repeatedly been condemned. *Brudenell* v. *Elwes*, 1 East, 451. *Mills* v. *Farmer*, 1 Meriv. 94. *Moggridge* v. *Thackwell*, 7 Ves. 87. *Cary* v. *Abbot*, Ib. 490. *Fontain* v. *Ravenel*, 17 How. 387. *Holland* v. *Peck*, 2 Ired. Eq. 261. *Beekman* v. *Bonsor*, 23 N. Y. 298.

In its origin and history, this jurisdiction was an exercise of prerogative power, and not of judicial. *Baptist Association* v. *Hart*, 4 Wheat. 1. *Ayres* v. *Methodist Church*, 3 Sandf. 351. *Andrew* v. *New York Bible, &c. Soc.* 4 Sandf. 156, 178. *White* v. *Fisk*, 22 Conn. 31. *Witman* v. *Lex*, 17 S. & R. 88. *Dickson* v. *Montgomery*, 1 Swan, (Tenn.) 348. The application of the doctrine is unconstitutional in Massachusetts, where the legislative and judicial departments are carefully separated. *Cy pres* is fitted only for a government of men, and not for a government of laws.

GRAY, J. This case presents for decision many important and interesting questions, which have been the subject of repeated discussion at the bar and of much deliberation and reflection by the court. The able and elaborate arguments of counsel have necessarily involved the consideration of the fundamental principles of the law of charities, and of a great number of the precedents from which they are to be derived;

and have disclosed such diversity of opinion upon the extent and application of those principles, and the just interpretation and effect of the adjudged cases, as to require the principles in question to be fully stated, and supported by a careful exami nation of authorities, in delivering judgment.

I. By the law of this commonwealth, as by the law of England, gifts to charitable uses are highly favored, and will be most liberally construed in order to accomplish the intent and purpose of the donor; and trusts which cannot be upheld in ordinary cases, for various reasons, will be established and carried into effect when created to support a gift to a charitable use. The most important distinction between charities and other trusts is in the time of duration allowed and the degree of definiteness required. The law does not allow property to be made inalienable, by means of a private trust, beyond the period prescribed by the rule against perpetuities, being a life or lives in being and twenty-one years afterwards; and if the persons to be benefited are uncertain and cannot be ascertained within that period, the gift will be adjudged void, and a resulting trust declared for the heirs at law or distributees. But a public or charitable trust may be perpetual in its duration, and may leave the mode of application and the selection of particular objects to the discretion of the trustees. *Sanderson* v. *White*, 18 Pick. 333. *Odell* v. *Odell*, 10 Allen, 5, 6, and authorities cited. *Saltonstall* v. *Sanders*, 11 Allen, 446. Lewin on Trusts, c. 2.

Each of the bequests in the will of Francis Jackson, which the court is asked in this case to sustain as charitable, is to a permanent board of trustees, for a purpose stated in general terms only. The question of the validity of these trusts is not to be determined by the opinions of individual judges or of the whole court as to their wisdom or policy, but by the established principles of law; and does not depend merely upon their being for lawful objects, but upon their being of that peculiar nature which the law deems entitlea to extraordinary favor because it regards them as charitable.

It has been strenuously contended for the heirs at law that neither of the purposes declared by the testator is charitable

within the intent and purview of the *St.* of 43 Eliz. *c.* 4, which all admit to be the principal test and evidence of what are in law charitable uses. It becomes necessary therefore to consider the spirit in which that statute has been construed and applied by the courts.

The preamble of the statute mentions three classes of charitable gifts, namely, First: For the relief and assistance of the poor and needy, specifying only "sick and maimed soldiers and mariners," "education and preferment of orphans," "marriages of poor maids," "supportation, aid and help of young tradesmen, handicraftsmen and persons decayed," "relief or redemption of prisoners and captives," and assistance of poor inhabitants in paying taxes, either for civil or military objects. Second: For the promoting of education, of which the only kinds specified in the statute (beyond the "education and preferment of orphans," which seems more appropriately to fall within the first class) are those "for maintenance of schools of learning, free schools, and scholars of universities." Third: For the repair and maintenance of public buildings and works, under which are enumerated "repair of ports, havens," and "seabanks," for promoting commerce and navigation and protecting the land against the encroachments of the sea; of "bridges," "causeways" and "highways," by which the people may pass from one part of the country to another; of "churches," in which religion may be publicly taught; and of "houses of correction."

It is well settled that any purpose is charitable in the legal sense of the word, which is within the principle and reason of this statute, although not expressly named in it; and many objects have been upheld as charities, which the statute neither mentions nor distinctly refers to. Thus a gift "to the poor" generally, or to the poor of a particular town, parish, age, sex, race, or condition, or to poor emigrants, though not falling within any of the descriptions of poor in the statute, is a good charitable gift. *Saltonstall* v. *Sanders*, 11 Allen, 455–461, and cases cited. *Magill* v. *Brown*, Brightly, 405, 406. *Barclay* v. *Maskelyne*, 4 Jur. (N. S.) 1294 *Chambers* v. *St. Louis*, 29

Missouri, 543. So gifts for the promotion of science, learning and useful knowledge, though by different means and in different ways from those enumerated under the second class; and gifts for bringing water into a town, for building a town-house, or otherwise improving a town or city, though not alluded to in the third class; have been held to be charitable. *American Academy* v. *Harvard College*, 12 Gray, 594. *Drury* v. *Natick*, 10 Allen, 177–182, and authorities cited. By modern decisions in England, gifts towards payment of the national debt, or " to the Queen's chancellor of the exchequer for the time being, to be applied for the benefit and advantage of Great Britain," are legal charities. Tudor on Charitable Trusts, (2d ed.) 14, 15, and cases cited. Sergeant Maynard, long before, gave an opinion that a bequest " to the public use of the country of New England" was a good disposition to a charitable use. 1 Hutchinson's Hist. Mass. (2d ed.) 101, *note.* And it may be mentioned as evidence of the use of the word " charitable " by the founders of Massachusetts, that it was applied by the Massachusetts Company in 1628, before they crossed the ocean, to " the common stock " to be " raised from such as bear good affection to the plantation and the propagation thereof, and the same to be employed only in defrayment of public charges, as maintenance of ministers, transportation of poor families, building of churches and fortifications, and all other public and necessary occasions of the plantation." 1 Mass. Col. Rec. 68.

No kind of charitable trusts finds less support in the words of the *St.* of 43 Eliz. than the large class of pious and religious uses, to which the statute contains no more distinct reference than in the words " repair of churches." Such uses had indeed been previously recognized as charitable, and entitled to peculiar favor, by many acts of parliament, as well as in the courts of justice. *Sts.* 13 Ed. I. *c.* 41; 17 Ed. II. *c.* 2; 23 Hen. VIII. *c.* 10; 1 Ed. VI. *c.* 14. *Anon.* Anderson, 43, pl. 108. *Pitts* v. *James*, Hob. 123. *Cheney's case*, Co. Lit. 342. *Gibbons* v. *Maltyard*, Popham, 6; *S. C.* Moore, 594. Coke's note to *Porter's case*, 1 Co. 26 a. *Bruerton's case*, 6 Co. 1 b, 2 a. *Barry* v. *Ley*, Dwight's Charity Cases, 92. In the latest of those acts, the

" erecting of grammar schools for the education of youth in virtue and godliness, the further augmenting of the universities, and better provision for the poor and needy," were classed with charities for the maintenance of preachers, and called " good and godly uses ; " and grammar schools were considered in those times an effectual means of forwarding the progress of the Reformation. *St.* 1 Ed. VI. *c.* 14, §§ 1, 8, 9. *Attorney General* v. *Downing,* Wilmot, 15. Boyle on Charities, 7, 8. Sir Francis Moore, who drew the *St.* of 43 Eliz., indeed says that a gift to maintain a chaplain or minister to celebrate divine service could not be the subject of a commission under the statute ; but " was of purpose omitted in the penning of the act," lest, in the changes of opinion in matters of religion, such gifts might be confiscated in a succeeding reign as superstitious. Yet he also says that such a gift might be enforced by " the chancellor by his chancery authority ; " and cites a case in which it was so decreed. Duke, (Bridgman's ed.) 125, 154. And from very soon after the passage of the statute, gifts for the support of a minister, the preaching of an annual sermon, or other uses connected with public worship and the advancement of religion, have been constantly upheld and carried out as charities in the English courts of chancery. *Anon.* Cary, 39. *Nash's Charity,* Dwight's Charity Cases, 114. *Pember* v. *Inhabitants of Knighton,* Herne on Charitable Uses, 101 ; *S. C.* Tothill (2d ed.) 34. Duke, 354, 356, 381, 570, 614. Boyle on Charities, 39–41. Tudor, 10, 11. So in this commonwealth, trusts for the support of public worship and religious instruction, or the spreading of religion at home or abroad, have always been deemed charitable uses. 4 Dane Ab. 237. *Bartlet* v. *King,* 12 Mass. 536. *Going* v. *Emery,* 16 Pick. 107. *Sohier* v. *St. Paul's Church,* 12 Met. 250. *Brown* v. *Kelsey,* 2 Cush. 243. *Earle* v. *Wood,* 8 Cush. 445. It is not necessary in this connection to speculate whether the admission of pious uses into the rank of legal charities in modern times is to be attributed to the influence of the civil law ; to their having been mentioned in the earlier English statutes ; to a more liberal interpretation, after religion had become settled in England, of the words " repair of churches,"

or, possibly, of the clauses relating to gifts for the benefit of education, in the *St.* of 43 Eliz.; or to the support given by the court of chancery to public charitable trusts, independently of any statute. It is sufficient for our present purpose to observe that pious and religious uses are clearly not within the strict words of the statute, and can only be brought within its pur-view by the largest extension of its spirit.

The civil law, from which the English law of charities was manifestly derived, considered wills made for good and pious uses as privileged testaments, which were not, like other wills void for uncertainty in the objects, and which must be carried into effect even if their conditions could not be exactly ob served; and included among such uses (which it declared to be in their nature perpetual) bequests for the poor, orphans, widows, strangers, prisoners, the redemption of captives, the maintenance of clergymen, the benefit of churches, hospitals, schools and colleges, the repairing of city walls and bridges, the erection of public buildings, or other ornament or improvement of a city Poth. Pand. *lib.* 30–32, *nos.* 57–62. Code, *lib.* 1, *tit.* 2, *cc.* 15, 19; *tit.* 3, *cc.* 24, 28, 42, 46, 49, 57. Godolphin's Orphan's Legacy, pt. 1, *c.* 5, § 4. 2 Kent Com. (6th ed.) 257. 2 Story on Eq. §§ 1137–1141. *McDonough* v. *Murdoch,* 15 How. 405, 410, 414.

Charities are not confined at the present day to those which were permitted by law in England in the reign of Elizabeth. A gift for the advancement of religion or other charitable purpose in a manner permitted by existing laws is not the less valid by reason of having such an object as would not have been legal at the time of the passage of the Statute of Charitable Uses. For example, charitable trusts for dissenters from the established church have been uniformly upheld in England since the Toleration Act of 1 W. & M. *c.* 18, removed the legal disabilities under which such sects previously labored. *Attorney General* v. *Hickman,* 2 Eq. Cas. Ab. 193; *S. C.* W. Kel. 34. *Loyd* v. *Spillet* 3 P. W. 344; *S. C.* 2 Atk. 148. *Attorney General* v. *Cock,* 2 Ves. Sen. 273. And in this country since the Revolution no distinction has been made between charitable gifts for the benefit of different religious sects.

Gifts for purposes prohibited by or opposed to the existing laws cannot be upheld as charitable, even if for objects which would otherwise be deemed such. The bounty must, in the words of Sir Francis Moore, be "according to the laws, not against the law," and "not given to do some act against the law." Duke, 126, 169. So Mr. Dane defines, as undoubted charities, "such as are calculated to relieve the poor, and to promote such education and employment as the laws of the land recognize as useful." 4 Dane Ab. 237. Upon this principle, the English courts have refused to sustain gifts for printing and publishing a book inculcating the absolute and inalienable supremacy of the pope in ecclesiastical matters; or for the support of the Roman Catholic or the Jewish religion, before such gifts were countenanced by act of parliament. *De Themmines* v. *De Bonneval*, 5 Russ. 288. Tudor, 21–25, and cases cited. And a bequest "towards the political restoration of the Jews to Jerusalem and to their own land," has been held void, as tending to create a political revolution in a friendly country. *Habershon* v. *Vardon*, 4 De Gex & Sm. 467. In a free republic, it is the right of every citizen to strive in a peaceable manner by vote, speech or writing, to cause the laws, or even the constitution, under which he lives, to be reformed or altered by the legislature or the people. But it is the duty of the judicial department to expound and administer the laws as they exist. And trusts whose expressed purpose is to bring about changes in the laws or the political institutions of the country are not charitable in such a sense as to be entitled to peculiar favor, protection and perpetuation from the ministers of those laws which they are designed to modify or subvert.

A precise and complete definition of a legal charity is hardly to be found in the books. The one most commonly used in modern cases, originating in the judgment of Sir William Grant, confirmed by that of Lord Eldon, in *Morice* v. *Bishop of Durham,* 9 Ves. 405, and 10 Ves. 541 — that those purposes are considered charitable which are enumerated in the *St.* of 43 Eliz. or which by analogies are deemed within its spirit and intendment — leaves something to be desired in point of certainty, and

suggests no principle. Mr. Binney, in his great argument in the Girard Will Case, 41, defined a charitable or pious gift to be " whatever is given for the love of God, or for the love of your neighbor, in the catholic and universal sense — given from these motives, and to these ends — free from the stain or taint of every consideration that is personal, private or selfish." And this definition has been approved by the supreme court of Pennsylvania. *Price* v. *Maxwell*, 28 Penn. State R. 35. A more concise and practical rule is that of Lord Camden, adopted by Chancellor Kent, by Lord Lyndhurst, and by the supreme court of the United States — " A gift to a general public use, which extends to the poor as well as the rich." *Jones* v. *Williams*, Ambl. 652. *Coggeshall* v. *Pelton*, 7 Johns. Ch. 294. *Mitford* v. *Reynolds*, 1 Phil. Ch. 191, 192. *Perin* v. *Carey*, 24 How. 506. A charity, in the legal sense, may be more fully defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government. It is immaterial whether the purpose is called charitable in the gift itself, if it is so described as to show that it is charitable in its nature.

If the words of a charitable bequest are ambiguous or contradictory, they are to be so construed as to support the charity, if possible. It is an established maxim of interpretation, that the court is bound to carry the will into effect, if it can see a general intention consistent with the rules of law, even if the particular mode or manner pointed out by the testator is illegal. *Bartlet* v. *King*, 12 Mass. 543. *Inglis* v. *Sailor's Snug Harbor*, 3 Pet. 117, 118. If the testator uses a word which has two meanings, one of which will effect and the other defeat his object, the first is to be adopted. *Saltonstall* v. *Sanders*, 11 Allen, 455. When a charitable intent appears on the face of the will, but the terms used are broad enough to allow of the fund being applied either in a lawful or an unlawful manner

the gift will be supported, and its application restrained within the bounds of the law.   The most frequent illustrations of this in the English courts have arisen under the *St.* of 9 Geo. II. *c.* 36, (commonly called the Statute of Mortmain,) prohibiting devises of land, or bequests of money to be laid out in land, to charitable uses.   In the leading case, Lord Hardwicke held that a direction to executors to "settle and secure, by purchase of lands of inheritance, or otherwise, as they shall be advised, out of my personal estate," two annuities to be paid yearly forever for charitable objects, was valid, because it left the option to the executor to make the investment in personal property, which was not prohibited by the statute; and said, "This bequest is not void, and there is no authority to construe it to be void, if by law it can possibly be made good," or (according to another and perhaps more accurate report) "no authority to construe it to be void by law, if it can possibly be made good." *Sorresby* v. *Hollins*, 9 Mod. 221; *S. C.* 1 Coll. Jurid. 439.   The doctrine of that case has ever since been recognized as sound law.  *Attorney General* v. *Whitchurch*, 3 Ves. 144.  *Curtis* v. *Hutton*, 14 Ves. 539. *Dent* v. *Allcroft*, 30 Beav. 340.   *Mayor &c. of Faversham* v. *Ryder*, 5 De Gex, Macn. & Gord. 353.   *Edwards* v. *Hall*, 11 Hare, 12; *S. C.* 6 De Gex, Macn. & Gord. 89.   In a like spirit the house of lords recently decided that a bequest to erect buildings for charitable purposes if other lands should be given was valid, and could not be held to be impliedly prohibited by the *St.* of 9 Geo. II.   *Philpott* v. *St. George's Hospital,* 6 H. L. Cas. 338. The rule stated in *Attorney General* v. *Williams*, 2 Cox Ch. 388, and *Tatham* v. *Drummond*, 11 Law Times, (N. S.) 325, upon which the heirs at law rely, that "the court will not alter its conception of the purposes of a testator, merely because those intentions happen to fall within the prohibition of the Statute of Mortmain," shows that no forced construction of the testator's language is to be adopted to avoid illegality, but does not affect the principle that a bequest which according to the fair meaning of the words may include a legal as well as an illegal application is to be held valid.

In the light of these general principles, we come to the consideration of the language of the different bequests in this will.

II  The first bequest which is drawn in question is that con
tained in the fourth article of the will, by which the sum of ten
thousand dollars is given in trust to be used and expended at
the discretion of the trustees, " in such sums, at such times and
such places as they deem best, for the preparation and circula-
tion of books, newspapers, the delivery of speeches, lectures and
such other means as in their judgment will create a public sen-
timent that will put an end to negro slavery in this country ; "
and the testator expresses a desire that they may become a
permanent organization, and a hope " that they will receive
the services and sympathy, the donations and bequests, of the
friends of the slave."

Among the charitable objects specially designated in the *St.*
of 43 Eliz. is the " relief or redemption of prisoners and cap-
tives."  And this was not a peculiarity of the law of England
or of that age.  The civil law regarded the redemption of cap-
tives as the highest of all pious uses — in the words of Jus-
tinian, *causa piissima* — and not only declared that no heir,
trustee or legatee should infringe or unjustly defeat the pious
intentions of the testator by asserting that a legacy or trust for
the redemption of captives was uncertain ; and provided for the
appointment of a trustee when none was named in the will, and
for informing him of the bequest; but even authorized churches
to alienate their sacred vessels and vestments for this one pur-
pose, upon the ground that it was reasonable that the souls or
lives of men should be preferred to any vessels or vestments
whatsoever — *quoniam non absurdum est animas hominum quibus-
cunque vasis vel vestimentis preferri.*  Code, *lib.* 1, *tit.* 2, *c.* 22 ;
*tit.* 3, *cc.* 28, 49 ; *lib.* 8, *tit.* 54, *c.* 36.  Novell. 7, *c.* 8 ; 115, *c.* 3 ;
120, *c.* 10 ; 131, *c.* 11.  Godolphin's Orphan's Legacy, pt. 1,
*c.* 5, § 4.

The captives principally contemplated in the *St.* of 43 Eliz.
were doubtless Englishmen taken and held as slaves in Turkey
and Barbary.  And the relief of our own citizens from such cap-
tivity was always deemed charitable in Massachusetts, an illus-
tration of which is found in the records of the governor and
council in 1693, by whom a petition of the relations of two

inhabitants of the Province, " some time since taken by a Salley man of war, and now under Turkish captivity and slavery," for permission " to ask and receive the charity and public contribution of well disposed persons for redeeming them out of their miserable suffering and slavery," was granted; " the money so collected to be employed for the end aforesaid, unless the said persons happen to die before, make their escape, or be in any other way redeemed; then the money so gathered to be improved for the redemption of some others of this province, that are or may be in like circumstances, as the governor and council shall direct." Council Rec. 1693, fol. 323. · But there is no more reason for confining the words of the Statute of Elizabeth to such captives, than for excluding from the class of religious charities gifts for preaching the gospel to the heathen, which have uniformly been sustained as charitable, here and in England. Boyle on Charities, 41. *Bartlet* v. *King*, 12 Mass. 536. Indeed it appears by Sir Francis Moore's reading upon the statute, that even in his time the word " captives " might include captive enemies. Duke, 158.

It was argued that the slave trade was fostered and rewarded by the English government in the reign of Elizabeth, and therefore gifts for the relief of negro slaves could not be deemed within the purview of the Statute of Charitable Uses. The fact is undoubted; but the conclusion does not follow. The permission of slavery by law does not prevent emancipation from being charitable. A commission of manumission, granted by Queen Elizabeth, twenty-seven years before the statute, recites that in the beginning God created all men free by nature, and afterwards the law of nations placed some under the yoke of slavery, and that the queen believed it would be pious and acceptable to God and according to Christian charity — *pium fore credimus et Deo acceptabile Christianæque charitati consentaneum* — to wholly enfranchise the villeins of the crown on certain royal manors. 20 Howell's State Trials, 1372. See also Barrington on Sts. (5th ed.) 305, 308. The spirit of the Roman law upon this point is manifested by an edict of Constantine, which speaks of those who with a religious sentiment

in the bosom of the church grant their slaves that liberty which is their due — *qui religiosâ mente in ecclesiæ gremio servis suis meritam concesserint libertatem.* Cod. *lib.* 1, *tit.* 13, *c.* 2. That the words of the Statute of Charitable Uses may be extended to negro slaves of English masters is clearly shown by the decision of Lord Cottenham, when master of the rolls, applying for the benefit of negroes in the British Colonies in the West Indies the accumulations of a bequest made in 1670 " to redeem poor slaves." *Attorney General* v. *Gibson,* 2 Beav. 317, note ; *S. C.* cited Cr. & Phil. 226. In dealing with such a question, great regard is to be had to the favor which the law gives to liberty, so eloquently expressed by Chief Justice Fortescue : *Crudelis enim necessario judicabitur lex, quæ servitutem augmentat et minuit libertatem. Nam pro eâ natura semper implorat humana. Quia ab homine et pro vitio introducta est servitus. Sed libertas a Deo hominis est indita naturæ. Quare ipsa ab homine sublata semper redire gliscit, ut facit omne quod liber tati naturali privatur. Quo ipse et crudelis judicandus est, qui libertati non favet. Hæc considerantia Angliæ jura in omni casu libertati dant favorem.* Fortescue de Laudibus, c. 42.

But the question of the lawfulness of this gift, if falling within the class of charitable uses, depends not upon the laws and the public policy of England at the time of the passage of the statute, but upon our own at the time of the death of the testator. It was seriously argued that, before the recent amendment of the Constitution of the United States, " a trust to create a sentiment to put an end to negro slavery, would, having regard to the Constitution and laws under which we live, be against public policy and thus be void ; " but the court is unable to see any foundation for this position in the Constitution and laws, either of the United States or of this Commonwealth.

The law of Massachusetts has always been peculiarly favorable to freedom, as may be shown by a brief outline of its history. The " rights, liberties and privileges," established by the general court of the Colony in 1641, to be " impartially and inviolably enjoyed and observed throughout our jurisdictior forever," declared, " There shall never be any bond slavery

villenage or captivity amongst us, unless it be lawful captives taken in just wars, and such strangers as willingly sell themselves or are sold to us. And these shall have all the liberties and Christian usages which the law of God established in Israel concerning such persons doth morally require. This exempts none from servitude who shall be judged thereto by authority." The last proviso evidently referred to punishment for crime. Body of Liberties, art. 91. This article, leaving out the word "strangers" in the clause as to slaves acquired by sale, was included in each revision of the laws of the Colony. Mass. Col. Laws, (ed. 1660) 5; (ed. 1672) 10. 4 Mass. Col. Rec. pt. ii. 467. It is worthy of observation, that the tenure upon which the Massachusetts Company held their charter, as declared in the charter itself, was as of the manor of East Greenwich in the county of Kent; that no one was ever born a villein in Kent; Yearbook 30 Ed. I. 168; *S. C.* Fitz. Ab. Villenage, 46; 3 Selden's Works, 1876; and that the Body of Liberties contained articles upon each of the principal points distinctive of the Kentish tenure of gavelkind — freedom from escheats on attainder and execution for felony, the power to devise, the age of alienation, and descent to all the sons together — adopting some and modifying others. Body of Liberties, arts. 10, 11, 53, 81. 2 Bl. Com. 84.

In the laws of Europe, at the time of the foundation of the Colony, descent was named first among the sources of slavery. The common law, following the civil law, repeated *Servi aut nascuntur aut fiunt*, and differed only in tracing it through the father, instead of the mother; and each system recognized that a man might become a slave by capture in war, or by his own consent or confession in some form. Justinian's Institutes, *lib.* 1, *tit.* 3. Bract. 4 *b.* Fleta, *lib.* 1, *c.* 3. *Eedes* v. *Holbadge,* Acta Canc. 393. Swinburne on Wills, pt. 2, sect. 7. Co. Lit. 117 *b.* And such was then the established law of nations. Grotius de Jure Belli, *lib.* 2, *c.* 5, sects 27, 29; *lib.* 3, *c.* 7. In parts of England, hereditary villenage would seem to have still existed in fact; and it was allowed by law until since the American Revolution. *Pigg* v. *Caley,* Noy, 27. Co. Lit. 116–140. 2 Inst.

28, 45. 2 Rol. Ab. 732. *Smith* v. *Brown*, 2 Salk. 666; *S. C* Holt, 495. *Smith* v. *Gould*, 2 Salk. 667; *S. C.* 2 Ld. Raym. 1275. *Treblecock's case*, 1 Atk. 633. *The King* v. *Thames Ditton*, 4 Doug. 302. Lord Bacon, in explaining the maxim, *Jura sanguinis nullo jure civili dirimi possunt*, with a coolness which shows that in his day and country the illustration was neither unfamiliar nor shocking, says, " If a villein be attainted, yet the lord shall have the issues of his villein born before or after his attainder; for the lord hath them *jure naturæ* but as the increase of a flock." Bac. Max. *reg*. 11.

The Massachusetts Body of Liberties, as Governor Winthrop tells us, was composed by Nathaniel Ward, who had been " formerly a student and practiser in the course of the common law." 2 Winthrop's Hist. New England, 55. In view of the other laws of the time, the omission, in enumerating the legal sources of slavery, of birth, the first mentioned in those laws, is significant. No instance is known in which the lawfulness of hereditary slavery in Massachusetts under the charter of the Colony or the Province was affirmed by legislative or judicial authority; and it has been denied in a series of judgments of this court, beginning in the last century, in each of which it was essential to the determination of the rights of the parties. *Littleton* v. *Tuttle*, 4 Mass. 128, *note*. *Lanesborough* v. *Westfield*, 16 Mass. 74. *Edgartown* v. *Tisbury*, 10 Cush. 408. The case of *Perkins* v. *Emerson*, 2 Dane Ab. 412, did not touch this question; but simply determined that a person received into a house as a slave of the owner was not received " as an inmate, boarder or tenant," so that notice of the place whence such person last came must be given to the selectmen under the Prov. St. of 10 Geo. II., Anc. Chart. 508. No doubt many children of slaves were in fact held as slaves here, especially after the Province Charter, during the period of which all acts of the general court were required to be transmitted to England for approval, earlier ordinances which had not been so approved were hardly recognized by the English government as of any force, the policy of England restrained the colonists from abolishing the African slave trade, and the number of slaves (which had been very

small under the comparatively independent government of the Colony) was much increased. The practice of a whole people does not always conform to its laws. Thousands of negroes were held as slaves in England and commonly sold in public at the very time when Lord Mansfield and other judges decided such holding to be unlawful. *Sommersett's case*, 20 Howell's State Trials, 72, 79; *S. C.* Lofft, 17. Quincy, 97, note. *The Slave Grace*, 2 Hagg. Adm. 105, 106.

While negro slavery existed in Massachusetts, it was in a comparatively mild form. The marriages of slaves were protected by the legislature and the courts; according to the opinion of Hutchinson and of Dane, slaves might hold property; they were admitted as witnesses, even on capital trials of white persons, and on suits of other slaves for freedom; they might sue their masters for wounding or immoderately beating them; and indeed hardly differed from apprentices or other servants except in being bound for life. See authorities and records cited in Quincy, 30, 31, *note;* 2 Dane Ab. 313. The annual tax acts show that before the Declaration of Independence they were usually taxed as property, always afterwards as persons. The general court in September 1776 forbade the sale of two negroes taken as prize of war on the high seas and brought into this state, and resolved that any negroes so taken and brought in should not be allowed to be sold, but should be treated like other prisoners. Res. September 1776, *c.* 83.

It was in Massachusetts, by the first article of the Declaration of Rights prefixed to the Constitution adopted in 1780, as immediately afterwards interpreted by this court, that the fundamental axioms of the Declaration of Independence — " that all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness " — first took at once the form and the force of express law; slavery was thus wholly abolished in Massachusetts; and it has never existed here since, except so far as the Constitution and laws of the State were held to be prevented by the Constitution and laws of the United States from operating upon fugitive slaves. *Caldwell* v.

*Jennison*, Rec. 1781, fol. 79, 80. *Jennison's petition*, Journal H. R. June 18, 1782, fol. 89. *Commonwealth* v. *Jennison*, Rec. 1783, fol. 85. Parsons, C. J., in *Winchendon* v. *Hatfield*, 4 Mass. 128. 4 Mass. Hist. Coll. 203, 204. *Commonwealth* v. *Aves*, 18 Pick. 208, 210, 215, 217. 2 Kent Com. (6th ed.) 252. *Betty* v. *Horton*, 5 Leigh, 623.

The doctrine of our law, upon this subject, as stated by Chief Justice Shaw in delivering the judgment of the court in *Commonwealth* v. *Aves*, just cited, is that slavery is a relation founded in force, contrary to natural right and the principles of justice, humanity and sound policy; and could exist only by the effect of positive law, as manifested either by direct legislation or settled usage. The same principle has been recognized by Chief Justice Marshall and Mr. Justice Story, speaking for the supreme court of the United States. *The Antelope*, 10 Wheat. 120, 121. *Prigg* v. *Pennsylvania*, 16 Pet. 611.

The Constitution of the United States uniformly speaks of those held in slavery, not as property, but as persons; and never contained anything inconsistent with their peaceable and voluntary emancipation. As between master and slave, it would require the most explicit prohibition by law to restrain the right of manumission. *M' Cutchen* v. *Marshall*, 8 Pet. 238. We cannot take judicial notice of the local laws of other states of the Union except so far as they are in proof. *Knapp* v. *Abell*, 10 Allen, 488. But it appears by cases cited at the bar that bequests of manumission were formerly favored in Virginia; and that it was more recently decided in Mississippi that a trust created by will for paying the expenses of transporting the testator's slaves to Africa and maintaining them in freedom there was lawful. *Charles* v. *Hunnicutt*, 5 Call, 311. *Wade* v. *American Colonization Society*, 7 Sm. & Marsh. 663. A state of slavery, in which manumission was wholly prohibited, has never been known among civilized nations. Even when slavery prevailed throughout the world, the same common law of nations, *jus gentium*, which justified its existence, recognized the right of manumission as a necessary consequence. Justinian's Institutes, *lib.* 1, *tit.* 5.

We fully concur with the learned counsel for the heirs at law that if this trust could not be executed according to the intention of the testator without tending to excite servile insurrections in other states of the Union, it would have been unlawful; and that a trust which looked solely to political agitation and to attempts to alter existing laws could not be recognized by this court as charitable. But such does not appear to us to be the necessary or the reasonable interpretation of this bequest. The manner stated of putting an end to slavery is not by legislation or political action, but by creating a public sentiment, which rather points to moral influence and voluntary manumission. The means specified are the usual means of public instruction, by books and newspapers, speeches and lectures. Other means are left to the discretion of the trustees, but there is nothing to indicate that they are not designed to be of a kindred nature. Giving to the bequest that favorable construction to which all charitable gifts are entitled, the just inference is that lawful means only are to be selected, and that they are to be used in a lawful manner.

It was further objected that "to create a public sentiment" was too vague and indefinite an object to be sustained as a charitable use. But "a public sentiment" on a moral question is but another name for public opinion, or a harmony of thought — *idem sentire.* The only case cited for the heirs at law in support of this objection was *Browne* v. *Yeall,* 7 Ves. 50, *note,* in which Lord Thurlow held void a perpetual trust for the purchase and distribution in Great Britain and its dominions of such books as might have a tendency to promote the interests of virtue and religion and the happiness of mankind. But the correctness of that decision was doubted by Sir William Grant and Lord Eldon in *Morice* v. *Bishop of Durham,* 9 Ves. 406, and 10 Ves. 534, 539; and it is inconsistent with the more recent authorities, here and in England. The bequest now before us is quite as definite as one "for the increase and improvement of Christian knowledge and promoting religion," and the purchase from time to time of such bibles and other religious books, pamphlets and tracts as the trustees should

think fit for that purpose, which was upheld by Lord Eldon in. *Attorney General* v. *Stepney*, 10 Ves. 22; or "to the cause of Christ, for the benefit and promotion of true evangelical piety and religion," through the agency of trustees, to be by them " appropriated to the cause of religion as above stated, to be distributed in such divisions and to such societies and religious charitable purposes as they may think fit and proper," which was sustained by this court in *Going* v. *Emery*, 16 Pick. 107; or " for the promotion of such religious and charitable enterprises as shall be designated by a majority of the pastors composing the Middlesex Union Association," as in *Brown* v. *Kelsey*, 2 Cush. 243; or to be distributed, at the discretion of trustees, " in aid of objects and purposes of benevolence or charity, public or private," as in *Saltonstall* v. *Sanders*, 11 Allen, 446; or " for the cause of peace," to be expended by an unincorporated society, whose object, as defined in its constitution, was " to illustrate the inconsistency of war with Christianity, to show its baleful influence on all the great interests of mankind, and to devise means for insuring universal and permanent peace," as in *Tappan* v. *Deblois*, 45 Maine, 122; or to found " an establishment for the increase and diffusion of knowledge among men; " or " for the benefit and advancement and propagation of education and learning in every part of the world, as far as circumstances will permit; " as in *Whicker* v. *Hume*, 7 H. L. Cas. 124, 155, and *President of United States* v. *Drummond*, there cited. See also *McDonough* v. *Murdoch*, 15 How. 405, 414.

The bequest itself manifests its immediate purpose to be to educate the whole people upon the sin of a man's holding his fellow-man in bondage ; and its ultimate object, to put an end to negro slavery in the United States ; in either aspect, a lawful charity.

It is universally admitted that trusts for the promotion of religion and education are charities. Gifts for the instruction of the public in the cure of the diseases of quadrupeds or birds useful to man, or for the prevention of cruelty to animals, (either by publishing newspapers on the subject, or by providing establishments where killing them for the market might be attended

with as little suffering as possible,) have been held charitable in England. *London University* v. *Yarrow*, 23 Beav. 159 ; *S. C.* 1 De Gex & Jones, 72. *Marsh* v. *Means*, 3 Jur. (N. S.) 790. *Tatham* v. *Drummond*, 11 Law Times, (N. S.) 325. To deliver men from a bondage which the law regards as contrary to natural right, humanity, justice and sound policy, is surely not less charitable than to lessen the sufferings of animals. The Constitution of Massachusetts, which declares that all men are born free and equal, and have the natural, essential and unalienable rights of enjoying and defending their lives and liberties, of acquiring, possessing and protecting property, of seeking and obtaining their safety and happiness ; also declares that a frequent recurrence to the fundamental principles of the Constitution, and a constant adherence to those of piety and justice, are absolutely necessary to preserve the advantages of liberty and to maintain a free government ; that " the encouragement of arts and sciences, and all good literature, tends to the honor of God, the advantage of the Christian religion, and the great benefit of this and the other United States of America ; " and that " wisdom and knowledge, as well as virtue, diffused generally among the body of the people, being necessary for the preservation of their rights and liberties, and as these depend on spreading the opportunities and advantages of education in the various parts of the country, and among the different orders of the people, it shall be the duty of legislatures and magistrates, in all future periods of this commonwealth," besides cherishing the interests of literature and the sciences, " to countenance and inculcate the principles of humanity and general benevolence, public and private charity," " and all social affections and generous sentiments among the people." Declaration of Rights, arts. 1, 18. Constitution of Mass. *c.* 5. This bequest directly tends to carry out the principles thus declared in the fundamental law of the Commonwealth. And certainly no kind of education could better accord with the religion of Him who came to preach deliverance to the captives, and taught that you should love your neighbor as yourself and do unto others as you would that they should do unto you.

The authorities already cited show that the peaceable re-demption or manumission of slaves in any manner not prohib-ited by law is a charitable object. It falls indeed within the spirit, and almost within the letter, of many clauses in the Statute of Elizabeth. It would be an anomaly in a system of law, which recognized as charitable uses the relief of the poor, the educa-tion and preferment of orphans, marriages of poor maids, the assistance of young tradesmen, handicraftsmen and persons decayed, the relief of prisoners and the redemption of captives, to exclude the deliverance of an indefinite number of human beings from a condition in which they were so poor as not even to own themselves, in which their children could not be educated, in which marriages had no sanction of law or secur-ity of duration, in which all their earnings belonged to another, and they were subject, against the law of nature, and without any crime of their own, to such an arbitrary dominion as the modern usages of nations will not countenance over captives taken from the most barbarous enemy.

III. The next question arises upon the bequest in trust for the benefit of fugitive slaves who might from time to time escape from the slaveholding states of the Union.

The validity of this bequest must be determined according to the law as it stood at the time when the testator died and from which his will took effect. It is no part of the duty of this court to maintain the constitutionality, the justice, or the policy of the fugitive slave acts, now happily repealed. But the Con-stitution of the United States, at the time of the testator's death, declared that no person held to service or labor in one state should be discharged therefrom by escaping into another. It may safely be assumed that, under such a constitution, a bequest to assist fugitive slaves to escape from those to whom their service was thus recognized to be due could not have been upheld and enforced as a lawful charity. The epithets with which the testator accompanied this bequest show that he set his own ideas of moral duty above his allegiance to his state or his country; and warrant the conjecture that he would have been well pleased to have the fund applied in a manner

inconsistent with the Constitution and laws of the United States. But he has used no words to limit its use to illegal methods, and has left his trustees untrammelled as to the mode of its application.

Whether this bequest is or is not valid is to be ascertained from a fair construction of its language, in the light of the maxims of interpretation stated in the earlier part of this opinion, by which the court is bound to carry into effect any charitable bequest in which can be seen a general intention consistent with the law, even if the particular mode pointed out is illegal; and there is no authority to construe it to be void if it can be applied in a lawful manner consistently with the intention of the testator as manifested in the words by which it is expressed. One illustration of these maxims may be added in this connection.

In *Isaac* v. *Gompertz*, Ambl. (2d ed.) 228, note, the will contained one bequest for the support and maintenance of a Jews' synagogue; and another bequest of an annuity " to the gabas of the said synagogue," who were found, upon inquiry by a master, to be treasurers of the synagogue, whose office it was to collect and receive the annual subscriptions for the support of poor Jews belonging to the synagogue, and to apply the same to the expenses of supporting the synagogue and to the maintenance of such poor Jews. This last bequest was upheld, and referred to a master to report a scheme, although the support of the synagogue was adjudged to be an unlawful use; and thus a bequest manifestly intended for the benefit of persons professing a religion not tolerated by law, and which might, according to its terms, be applied either in an unlawful or a lawful manner, was sustained as charitable, and its application confined to the lawful mode.

A bequest for the benefit of fugitive slaves is not necessarily unlawful. The words " relief or redemption of prisoners and captives " have always been held in England to include those in prison under condemnation for crime, as well as persons confined for debt; and to support gifts for distributing bread and meat among them annual'y, or for enabling poor imprisoned

debtors to compound with their creditors. Duke, 131, 156. *Attor ney General* v. *Ironmongers' Co.* C. P. Coop. Pract. Cas. 285, 290. *Attorney General* v. *Painterstainers' Co.* 2 Cox Ch. 51. *Attorney General* v. *Drapers' Co.* Tudor, 591, 592; *S. C.* 4 Beav. 67. 36th Report of Charity Commissioners to Parliament, pt. vi. 856–868. It would be hardly consistent with charity or justice to favor the relief of those undergoing punishment for crimes of their own committing, or imprisonment for not paying debts of their own contracting; and yet prohibit a like relief to those who were in equal need, because they had withdrawn themselves from a service imposed upon them by local laws without their fault or consent.

It was indeed held in *Thrupp* v. *Collett*, 26 Beav. 125, that a bequest to be applied to purchasing and procuring the discharge of persons committed to prison for non-payment of fines under the game laws was not a lawful charity. But such persons were convicted offenders against the law of England, who would by such discharge be wholly released from punishment. A fugitive slave was not a criminal by the laws of this commonwealth or of the United States.

To supply sick or destitute fugitive slaves with food and clothing, medicine and shelter, or to extinguish by purchase the claims of those asserting a right to their service and labor, would in no wise have tended to impair the claim of the latter or the operation of the Constitution and laws of the United States; and would clearly have been within the terms of this bequest. If, for example, the trustees named in the will had received this fund from the executor without question, and had seen fit to apply it for the benefit of fugitive slaves in such a manner, they could not have been held liable as for a breach of trust.

This bequest therefore, as well as the previous one, being capable of being applied according to its terms in a lawful manner at the time of the testator's death, must, upon the settled principles of construction, be held a valid charity.

It is hardly necessary to remark that the direction of the testator that his trustees shall not be accountable to any one is

simply void. No testator can obtain for his bequests that support and permanence which the law gives to public charities only, and at the same time deprive the beneficiaries and the public of the safeguards which the law provides for their due and lawful administration.

As the trustees named in the will are not a corporation established by law, and these two bequests are unlimited in duration, and by their terms might cover an illegal as well as a legal appropriation, it is the duty of the court, before ordering the funds to be paid to the trustees, to refer the case to a master to settle a scheme for their application in a lawful manner. *Isaac v. Gompertz*, Ambl. 228, *note.* *Attorney General* v. *Stepney*, 10 Ves. 22. Boyle on Charities, 100, 217.

IV. It is quite clear that the bequest in trust to be expended " to secure the passage of laws granting women, whether married or unmarried, the right to vote, to hold office, to hold, manage and devise property, and all other civil rights enjoyed by men," cannot be sustained as a charity.

No precedent has been cited in its support. This bequest differs from the others in aiming directly and exclusively to change the laws; and its object cannot be accomplished without changing the Constitution also. Whether such an alteration of the existing laws and frame of government would be wise and desirable is a question upon which we cannot, sitting in a judicial capacity, properly express any opinion. Our duty is limited to expounding the laws as they stand. And those laws do not recognize the purpose of overthrowing or changing them, in whole or in part, as a charitable use. This bequest therefore, not being for a charitable purpose, nor for the benefit of any particular persons, and being unrestricted in point of time, is inoperative and void.

For the same reason, the gift to the same object, of one third of the residue of the testator's estate after the death of his daughter Mrs. Eddy and her daughter Mrs. Bacon, is also invalid, and will go to his heirs at law as a resulting trust.

It is proper to add that the conclusion of the court upon this point, as well as upon the gift to create a public sentiment which

would put an end to negro slavery in the United States, had the concurrence of the late Mr. Justice Dewey, whose judicial expe-. rience and large acquaintance with the law of charitable uses give great weight to his opinion, and whose lamented death, while this case has been under advisement, has deprived us of his assistance in determining the other questions in controversy.

V. The validity of the other residuary bequests and devises depends upon the law of perpetuities as applied to private trusts. The principles of this branch of the.law have been so fully considered by the court in recent cases as to require no extended statement.

The general rule is that if any estate, legal or equitable, is given by deed or will to any person in the first instance, and then over to another person, or even to a public charity, upon the happening of a contingency which may by possibility not take place within a life or lives in being (treating a child in its mother's womb as in being) and twenty-one years afterwards, the gift over is void, as tending to create a perpetuity by making the estate inalienable; for the title of those taking the previous interests would not be perfect, and until the happening of the contingency it could not be ascertained who were entitled. *Brattle Square Church* v. *Grant,* 3 Gray, 142. *Odell* v. *Odell,* 10 Allen, 5, 7. If therefore the gift over is limited upon a single event which may or may not happen within the prescribed period, it is void, and cannot be made good by the actual happening of the event within that period.

But if the testator distinctly makes his gift over to depend upon what is sometimes called an alternative contingency, or upon either of two contingencies, one of which may be too remote and the other cannot be, its validity depends upon the event; or, in other words, if he gives the estate over on one contingency which must happen, if at all, within the limit of the rule, and that contingency does happen, the validity of the distinct gift over in that event will not be affected by the consideration that upon a different contingency, which might or might not happen within the lawful limit, he makes a disposition of his

estate, which would be void for remoteness. The authorities upon this point are conclusive. *Longhead* v. *Phelps*, 2 W. Bl. 704. Sugden and Preston, *arguendo*, in *Beard* v. *Westcott*, 5 B. & Ald. 809, 813, 814. *Minter* v. *Wraith*, 13 Sim. 52. *Evers* v. *Challis*, 7 H. L. Cas. 531. *Armstrong* v. *Armstrong*, 14 B. Monr. 333. 1 Jarman on Wills, 244. Lewis on Perp. *c.* 21. 2 Spence on Eq. 125, 126.

By the ninth and tenth articles of the will, the income of one third of the residue of the testator's estate, real and personal, is to be paid to his son James and to his daughter Mrs. Palmer, respectively, during life. Each of these articles contains a distinct direction that, in case such son or daughter shall die leaving no child surviving, the principal of his or her share shall be paid and conveyed to the board of trustees named in the fourth article, to be expended for the intent and purpose therein directed. As the first tenant for life in each bequest is living at the death of the testator, the event of such tenant's dying, leaving no child then living, must happen within the period of a life in being, if at all; and, if it does happen, the gift over to the charity will be valid. Neither James Jackson nor Mrs. Palmer therefore is entitled to a present equitable estate in fee. But as James, though now unmarried, may marry and have children who survive him, and as Mrs. Palmer's children may survive her, in either of which cases half of the income of the share would by the will go to such children during their lives and the bequest over to the charity be too remote, the validity and effect of that bequest over cannot be now determined. If the contingency upon which it is valid should hereafter occur, namely, the death of the testator's son or daughter, respectively, leaving no children surviving, the whole remainder of the share will then go to the charity established by the fourth article, and be paid, after the settlement of a scheme for its lawful application, to the trustees therein named.

VI. By the thirteenth amendment of the Constitution of the United States, adopted since the earlier arguments of this case, it is declared that "neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have

been duly convicted, shall exist within the United States or any place subject to their jurisdiction." The effect of this amendment upon the charitable bequests of Francis Jackson is the remaining question to be determined; and this requires a consideration of the nature and proper limits of the doctrine of *cy pres.*

It is contended for the heirs at law, that the power of the English chancellor, when a charitable trust cannot be administered according to its terms, to execute it so as to carry out the donor's intention as nearly as possible — *cy pres* — is derived from the royal prerogative or the *St.* of 43 Eliz. and is not an exercise of judicial authority; that, whether this power is prerogative or judicial, it cannot, or, if it can, should not, be exercised by this court; and that the doctrine of *cy pres,* even as administered in the English chancery, would not sustain these charitable bequests since slavery has been abolished.

Much confusion of ideas has arisen from the use of the term *cy pres* in the books to describe two distinct powers exercised by the English chancellor in charity cases, the one under the sign manual of the crown, the other under the general jurisdiction in equity; as well as to designate the rule of construction which has sometimes been applied to executory devises or powers of appointment to individuals, in order to avoid the objection of remoteness. It was of this last, and not of any doctrine peculiar to charities, that Lord Kenyon said, " The doctrine of *cy pres* goes to the utmost verge of the law, and we must take care that it does not run wild; " and Lord Eldon, " It is not proper to go one step farther." *Brudenell* v. *Elwes,* 1 East, 451 ; *S. C.* 7 Ves. 390. 1 Jarman on Wills, 261–263. Sugden on Powers. *c.* 9, sect. 9. *Coster* v. *Lorillard,* 14 Wend. 309, 348.

The principal, if not the only, cases in which the disposition of a charity is held to be in the crown by sign manual, are of two classes; the first, of bequests to particular uses charitable in their nature, but illegal, as for a form of religion not tolerated by law ; and the second, of gifts of property to charity generally, without any trust interposed, and in which either no appointment is provided for, or the power of appointment is delegated to persons who die without exercising it.

It is by the sign manual and in cases of the first class, that the arbitrary dispositions have been made, which were so justly condemned by Lord Thurlow in *Moggridge* v. *Thackwell*, 1 Ves. Jr. 169, and Sir William Grant in *Cary* v. *Abbot*, 7 Ves. 494, 495; and which, through want of due discrimination, have brought so much discredit upon the whole doctrine of *cy pres*. Such was the case of *Attorney General* v. *Baxter*, in which a bequest to Mr. Baxter to be distributed by him among sixty pious ejected ministers, (not, as the testator declared, for the sake of their nonconformity, but because he knew many of them to be pious and good men and in great want,) was held to be void, and given under the sign manual to Chelsea College; but the decree was afterward reversed, upon the ground that this was really a legacy to sixty individuals to be named. 1 Vern. 248; 2 Vern. 105; 1 Eq. Cas. Ab. 96; 7 Ves. 76. Such also was the case of *Da Costa* v. *De Pas*, in which a gift for establishing a jesuba or assembly for reading the Jewish law was applied to the support of a Christian chapel at a foundling hospital. Ambl. 228; 2 Swanst. 489 note; 1 Dick. 258; 7 Ves. 76, 81.

This power of disposal by the sign manual of the crown in direct opposition to the declared intention of the testator, whether it is to be deemed to have belonged to the king as head of the church as well as of the state, "intrusted and empowered to see that nothing be done to the disherison of the crown or the propagation of a false religion;" *Rex* v. *Portington*, 1 Salk. 162; *S. C.* 1 Eq. Cas. Ab. 96; or to have been derived from the power exercised by the Roman emperor, who was sovereign legislator as well as supreme interpreter of the laws; Dig. 33, 2, 17; 50, 8, 4; Code, *lib.* 1, *tit.* 2, *c.* 19; *tit.* 14, *c.* 12; is clearly a prerogative and not a judicial power, and could not be exercised by this court; and it is difficult to see how it could be held to exist at all in a republic, in which charitable bequests have never been forfeited to the use or submitted to the disposition of the government, because superstitious or illegal. 4 Dane Ab. 239. *Gass* v. *Wilhite*, 2 Dana, 176. *Methodist Church* v. *Remington.* 1 Watts, 226.

The second class of bequests which are disposed of by the king's sign manual is of gifts to charity generally, with no uses specified, no trust interposed, and either no provision made for an appointment, or the power of appointment delegated to particular persons who die without exercising it. Boyle on Charities, 238, 239. *Attorney General* v. *Syderfen*, 1 Vern. 224; *S. C.* 1 Eq. Cas. Ab. 96. *Attorney General* v. *Fletcher*, 5 Law Journal (N. S.) Ch. 75. This too is not a judicial power of expounding and carrying out the testator's intention, but a prerogative power of ordaining what the testator has failed to express. No instance is reported, or has been discovered in the thorough investigations of the subject, of an exercise of this power in England before the reign of Charles II. *Moggridge* v. *Thackwell*, 7 Ves. 69–81. Dwight's Argument in the Rose Will Case, 272. It has never, so far as we know, been introduced into the practice of any court in this country; and, if it exists anywhere here, it is in the legislature of the Commonwealth as succeeding to the powers of the king as *parens patriæ.* 4 Kent Com. 508, *note.* *Fontain* v. *Ravenel*, 17 How. 369, 384. *Moore* v. *Moore*, 4 Dana, 365, 366. *Witman* v. *Lex*, 17 S. & R. 93. *Attorney General* v. *Jolly*, 1 Rich. Eq. 108. *Dickson* v. *Montgomery*, 1 Swan, 348. *Lepage* v. *Macnamara*, 5 Iowa, 146. *Bartlet* v. *King*, 12 Mass. 545. *Sohier* v. *Massachusetts General Hospital*, 3 Cush. 496, 497. It certainly cannot be exercised by the judiciary of a state whose constitution declares that " the judicial department shall never exercise the legislative and executive powers, or either of them : to the end it may be a government of laws and not of men." Declaration of Rights, art. 30.

The jurisdiction of the court of chancery to superintend the administration and decree the performance of gifts to trustees for charitable uses of a kind stated in the gift stands upon different grounds ; and is part of its equity jurisdiction over trusts, which is shown by abundant evidence to have existed before the passage of the Statute of Charitable Uses. Sir Francis Moore records a case in which a man sold land to another upon confidence to perform a charitable use, which the grantor declared by his last will that the grantee should perform; " the bargain was

never enrolled, and yet the lord chancellor decreed that the heir should sell the land to be disposed according to the limitation of the use; and this decree was made the 24th of Queen Elizabeth, before the Statute of Charitable Uses, and this decree was made upon ordinary and judicial equity in chancery." *Symons's case,* Duke, 163. About the same time the court of chancery entertained a suit between two parties, each claiming to be trustee, to determine how bequests for the weekly relief of the poor of certain towns, for the yearly preferment of poor children to be apprentices, and for the curing of divers diseased people lying by the highway's side, should be " employed and bestowed according to the said will." *Reade* v. *Silles,* (27 Eliz.) Acta Canc. 559. A decree in 16 Eliz., confirming a report of the master of the rolls and others to whom a suit for enforcing a charitable trust founded by will had been referred, is cited in 1 Spence on Eq. 588, *note.* For years before the *St.* of 43 Eliz., or the similar act of 39 Eliz., suits in equity by some in behalf of all of the inhabitants of a parish were maintained to establish and enforce bequests for schools, alms or other charitable purposes for the benefit of the parish, which would have been too indefinite to be enforced as private trusts. *Parker* v. *Browne,* (12 Eliz.) 1 Cal. Pro. Ch. 81; *S. C.* 1 Myl. & K. 389, 390; Dwight's Charity Cases, 33, 34; in which the devise was in trust to a corporation incapable at law of taking. *Parrot* v. *Pawlet,* (21 Eliz.) Cary, 47. *Elmer* v. *Scot,* (24 Eliz.) Choice Cas. Ch. 155. *Matthew* v. *Marow,* (32–34 Eliz.) and *Hensman* v. *Hackney,* (38 Eliz.) Dwight's Charity Cases, 65, 77; in which the decrees approved schemes settled by masters in chancery. Many other examples are collected in the able and learned arguments, as separately printed in full, of Mr. Binney in the case of Girard's Will, and of Mr. Dwight in the Rose Will Case. And the existence of such a jurisdiction anterior to and independent of the statute is now generally admitted. *Vidal* v. *Girard,* 2 How. 194–196, and cases cited. *Perin* v. *Carey,* 24 How. 501. *Magill* v. *Brown,* Brightly, 346. 2 Kent Com. 286–288, and note. *Burbank* v. *Whitney,* 24 Pick. 152, 153. *Preachers' Aid Society* v. *Rich,* 45 Maine, 559. *Derby* v. *Derby,* 4 R. I. 436. *Urmey* v. *Wooden,* 1 Ohio State

R. 160. *Chambers* v. *St. Louis*, 29 Missouri, 543. 1 Spence on Eq. 588. Tudor, 102, 103.

The theory that the *St.* of 43 Eliz. enlarged the discretion of the chancellor to depart from the expressed intention of the founder of a charity is refuted by the words of the statute itself. After reciting that many gifts and appointments for the charitable purposes therein named " have not been employed according to the charitable intent of the givers and founders thereof by reason of frauds, breaches of trust, and negligence in those that should pay, deliver and employ the same; " it then, for redress and remedy thereof, authorizes the lord chancellor or lord keeper to make such decrees that the property " may be duly and faithfully employed to and for such of the charitable uses and intents before rehearsed respectively for which they were given, limited, assigned or appointed by the donors and founders thereof; " which decrees, " not being contrary or repugnant to the orders, statutes or decrees of the donors or founders," shall " stand firm and good, according to the tenor and purpose thereof, and shall be executed accordingly," until altered by the lord chancellor or lord keeper upon complaint by any party aggrieved; and upon such complaint the chancellor or keeper may " by such course as to their wisdoms shall seem meetest, the circumstances of the case considered, proceed to the examination, hearing and determining thereof; and upon hearing thereof shall and may annul, diminish, alter or enlarge " the decrees of the commissioners as " shall be thought to stand with equity and good conscience, according to the true intent and meaning of the donors and founders thereof." These last qualifications are specially marked by Lord Coke, who was attorney general at the passage of the statute and for some time before and after, and who adds, by way of note to the final clause, " This is the *lapis ductitius*, whereby the commissioners and chancellors must institute their course." 2 Inst. 712. See also Duke, 11, 156, 169, 372, 619.

In cases of bequests to trustees for charitable uses, the nature of which is described in the will, the chancellor acts in his equity jurisdiction over trusts; and the prerogative of the king

finds its appropriate exercise through his attorney general in bringing the case before the court of chancery for a judicial determination. This has been well explained by Lord Eldon. "It is the duty of a court of equity, a main part, originally almost the whole, of its jurisdiction, to administer trusts; to protect not the visible owner, who alone can proceed at law, but the individual equitably, though not legally, entitled. From this principle has arisen the practice of administering the trust of a public charity: persons possessed of funds appropriated to such purposes are within the general rule; but, no one being entitled to an immediate and peculiar interest to prefer a complaint, who is to compel the performance of these obligations, and to enforce their responsibility? It is the duty of the king, as *parens patriæ*, to protect property devoted to charitable uses; and that duty is executed by the officer who represents the crown for all forensic purposes. On this foundation rests the right of the attorney general in such cases to obtain by information the interposition of a court of equity." *Attorney General* v. *Brown*, 1 Swanst. 291; *S. C.* 1 Wils. Ch. 354. To the like effect are the opinions of Lord Redesdale in *Attorney General* v. *Mayor &c. of Dublin*, 1 Bligh N. R. 347, 348, and *Corporation of Ludlow* v. *Greenhouse*, Ib. 48, 62; of Lord Keeper Bridgman in *Attorney General* v. *Newman*, 1 Ch. Cas. 158; of Sir Joseph Jekyll in *Eyre* v. *Shaftsbury*, 2 P. W. 119; and of Lord Hardwicke in *Attorney General* v. *Middleton*, 2 Ves. Sen. 328; which also state that the jurisdiction of the court of chancery over charities was exercised on such informations before the *St.* of 43 Eliz. See also *Attorney General* v. *Carroll*, Acta Canc. 729; Dwight's Argument in the Rose Will Case, 259 – 268. This duty of maintaining the rights of the public, and of a number of persons too indefinite to vindicate their own, has vested in the Commonwealth, and is exercised here, as in England, through the attorney general. *Going* v. *Emery*, 16 Pick. 119. *County Attorney* v. *May*, 5 Cush. 338–340. Gen. Sts. *c.* 14, § 20. It is upon this ground that, in a suit instituted by the trustees of a charity to obtain the instructions of the court, the attorney general should be made a party defendant, as he has been by order of

the court in this case. *Harvard College* v. *Society for Promoting Theological Education*, 3 Gray, 280. Tudor, 161, 162. The power of the king or Commonwealth, thus exercised, is simply to present the question to a court of justice, not to control or direct its judicial action.

A charity, being a trust in the support and execution of which the whole public is concerned, and which is therefore allowed by the law to be perpetual, deserves and often requires the exercise of a larger discretion by the court of chancery than a mere private trust; for without a large discretionary power, in carrying out the general intent of the donor, to vary the details of administration, and even the mode of application, many charities would fail by change of circumstances and the happening of contingencies which no human foresight could provide against; and the probabilities of such failure would increase with the lapse of time and the remoteness of the heirs from the original donor who had in a clear and lawful manner manifested his will to divert his estate from his heirs for the benefit of public charities.

It is accordingly well settled by decisions of the highest authority, that when a gift is made to trustees for a charitable purpose, the general nature of which is pointed out, and which is lawful and valid at the time of the death of the testator, and no intention is expressed to limit it to a particular institution or mode of application, and afterwards, either by change of circumstances the scheme of the testator becomes impracticable, or by change of law becomes illegal, the fund, having once vested in the charity, does not go to the heirs at law as a resulting trust, but is to be applied by the court of chancery, in the exercise of its jurisdiction in equity, as near the testator's particular directions as possible, to carry out his general charitable intent. In all the cases of charities which have been administered in the English courts of chancery without the aid of the sign manual, the prerogative of the king acting through the chancellor has not been alluded to, except for the purpose of distinguishing it from the power exercised by the court in its inherent equitable jurisdiction with the assistance of its masters in chancery.

At the time of the settlement of the Massachusetts Colony

this power was most freely exercised by the court of chancery, either on information by the attorney general, or on proceedings by commission under the Statute of Charitable Uses. *Attorney General* v. *Warwick*, (1615, 1638) Dwight's Charity Cases, 140, 141 ; *S. C.* West Ch. 60, 62. *Bloomfield* v. *Stowemarket*, (1619) Duke, 644. In the last case, lands had been given before the Reformation to be sold, and the proceeds applied, one half to the making of a highway from the town in which the lands were, one fourth to the repair of a church in that town, and the other fourth to the priest of the church to say prayers for the souls of the donor and others ; and Lord Bacon decreed the establishment of the uses for making the highway and repairing the church, and directed the remaining fourth (which could not, by reason of the change in religion, be applied as directed by the donor) to be divided between the poor of the same town, and the poor of the town where the donor inhabited.

In the case of *Baliol College*, this doctrine was enforced by successive decrees of the greatest English chancellors between the English Revolution and our own, which have been recently confirmed by the unanimous decision of the house of lords. *Attorney General* v. *Guise*, 2 Vern. 166. *Attorney General* v. *Baliol College*, 9 Mod. 407. *Attorney General* v. *Glasgow College*, 2 Colly. R. 665; *S. C.* 1 H. L. Cas. 800. The case is of such importance and reported at different stages in so many books and at such length, that it may be well to state it. John Snell, an Episcopalian, who made his last will and died in 1679, while the form of religion established by law in Scotland as well as in England was Episcopal, gave lands in trust to apply the income for the maintenance and education at the university of Oxford of Scotchmen to be designated by the vice chancellor of that university and the heads of certain colleges therein, and who should, upon their admission, give security to enter into holy orders and to be sent into Scotland and there remain. After the Revolution of 1688, Presbyterianism was reëstablished in Scotland by act of parliament; and in 1690 an information was filed by the attorney general, at the relation of the vice chancellor and heads of colleges named in the will, against the

testator's heiress at law, suggesting a pretence by her that as Episcopacy and Prelacy had been abolished in Scotland, and the Presbyterian form of worship established instead, the testator's intentions could not be carried into effect, the devise became void, and the property reverted to her. But the lords commissioners of the great seal, by a decree passed in 1692, established the devise against her, ordered an account, and reserved all directions for the establishment of the charity. 2 Vern. 267, *note.* 2 Colly. R. 665–670. 1 H. L. Cas. 802–804, 820, 822. In 1693 the cause came on for further directions before Lord Keeper Somers, who, acting upon the doctrine that it was within the province of a court of equity to administer the trust upon the principle of *cy pres,* ordered the estate to be conveyed to the six senior fellows of Baliol College, one of the colleges named in the will, to maintain a certain number of Scotch scholars at that college, and, in consideration of the privileges enjoyed by such scholars, to apply the surplus income to its library; and this decree was made subject to such alteration and disposition as the court should from time to time make, upon the application of any person concerned, for the better and more effectual execution of the trust, as near as could be to the testator's will and intentions. 2 Vern. 267, *note.* 2 Colly. R. 670, 671. 1 H. L. Cas. 804, 805, 824. In 1744 Lord Hardwicke, in the execution of the directions in the decree of Lord Somers, referred the cause to a master to approve of a scheme " for the better establishment and regulation of the charity, and carrying the same into effect for the future as near to the will and intention of the testator as the alteration of circumstances since the making of the will would admit;" and upon his report, and against the exceptions of the heads of colleges in Oxford, confirmed a scheme which did not impose any condition of the scholars taking holy orders — thus carrying out the general intention of the trust so far as to educate Scotch scholars at Oxford, although the testator's ultimate object that they should be educated in the Episcopal form of church government to take part in the established religion in Scotland could not, by reason of the change of law since his death, be effected. 9 Mod.

407. 1 H. L. Cas. 805, 806, 825–827. In 1759 Lord Keeper Henley (afterward Lord Northington) varied the scheme in other particulars, but declined to vary it in this; and further orders were afterwards made in chancery as the revenues increased. 2 Colly. R. 672–674. 1 H. L. Cas. 806, 807, 825, 826. 3 Ves. Jr. 650, *note.* Upon a new information filed at the relation of some Scotch Episcopalians, the house of lords in 1848, reversing an order of Vice Chancellor Knight Bruce, held that the charity must continue to be administered according to the ear'ier decrees. 1 H. L. Cas. 800.

In another case, Queen Elizabeth, by letters patent, established a hospital for forty lepers, and made the inmates a corporation. After leprosy had become almost extinct in England, and the members of the corporation reduced to three, an information was filed, alleging that the corporation was dissolved, and praying for a new application of the revenues agreeably to the letters patent and the donor's intention, or as near thereto as circumstances would permit and the court should direct. Lord Eldon held that neither the donor's heirs at law nor the crown took the land discharged of the charity; referred the case to a master to report a scheme; and confirmed the report of the master, approving a scheme for the application of the revenues to a general infirmary, reserving a preference to all lepers who might offer themselves. *Attorney General* v. *Hicks,* Highmore on Mortmain, 336–354; *S. C.* 3 Bro. C. C. 166, *note.*

Sir John Romilly, M. R., afterwards made a like decision, holding that a gift made in 1687 of land (for which in 1774 other land had been substituted by leave of parliament) in trust out of the income to keep it ready for a hospital and burial place for patients sick of the plague, was a present gift for charitable purposes, and valid, although the plague had not reappeared in England for more than one hundred and eighty years; and, after alluding to a class of cases, cited for the heirs at law in that case, as they have been in this, in which the charitable bequest could never have taken effect, added, "But who can say, when this deed was executed or the act passed, that this was not a charitable trust, capable of being performed;"

" and if it were ever wholly devoted to. charity, those cases do not apply." *Attorney General* v. *Craven*, 21 Beav. 392, 408.

The principle that a bequest to trustees for charitable purposes indicated in the will, which are lawful and capable of being carried out at the time of the testator's death, will not be allowed to fail and result to the heirs at law upon a change of circumstances, but will be applied by the court according to a scheme approved by a master to carry out the intent of the testator as nearly as possible, has been affirmed and acted on in many other English cases. *Attorney General* v. *Pyle*, 1 Atk. 435. *Attorney General* v. *Green*, 2 Bro. C. C. 492. *Attorney General* v. *Bishop of London*, 3 Bro. C. C. 171. *Moggridge* v. *Thackwell*, Ib. 517; *S. C.* 1 Ves. Jr. 464. *Attorney General* v. *Glyn*, 12 Sim. 84. *Attorney General* v. *Lawes*, 8 Hare, 32. *Attorney General* v. *Vint*, 3 De Gex & Sm. 705. The *dicta* of Lord Alvanley, upon which the heirs at law much rely, do not, in the connection in which they were uttered, substantially differ from the general current of authority. *Attorney General* v. *Boultbee*, 2 Ves. Jr. 387, 388. *Attorney General* v. *Whitchurch*, 3 Ves. 143, 144. *Attorney General* v. *Minshull*, 4 Ves. 14.

By the opinion of Lord Eldon, formed after great doubt and hesitation, the principle has been held to extend to the case of a bequest of property to a person named, in trust for such charitable purposes, not otherwise described, as he should appoint. *Moggridge* v. *Thackwell*, 7 Ves. 96 ; *S. C.* 13 Ves. 416. *Paice* v. *Archbishop of Canterbury*, 14 Ves. 364. *Mills* v. *Farmer*, 19 Ves. 483 ; *S. C.* 1 Meriv. 55. Such a trust has been held valid in this commonwealth, so far as to vest a title in the trustee as against the next of kin. *Wells* v. *Doane*, 3 Gray, 201. Whether, in case of his death, it could properly be administered by a court of chancery, without the aid of the prerogative power, need not be considered in this case. See *Fontain* v. *Ravenel*, 17 How. 387, 388 ; *Moore* v. *Moore*, 4 Dana, 366.*

In most of the cases cited at the argument, in which the heirs at law were held to be entitled to the property, the charitable gift never took effect at all; either because it could not be

---

* See also *Lorings* v. *Marsh*, 6 Wallace, 337.

carried out as directed, without violating the Mortmain Act of 9 Geo. II., as in *Jones* v. *Williams*, Ambl. 651; *Attorney General* v. *Whitchurch*, 3 Ves. 141; and *Smith* v. *Oliver*, 11 Beav. 481; or because the testator had in terms limited it to a special object which could not be accomplished at the time of his death; as in the case of a bequest to build a church in Wheatley, which could not be done without the consent of the bishop, and he refused; *Attorney General* v. *Bishop of Oxford*, 1 Bro. C. C. 444. note; *S. C.* cited 2 Cox Ch. 365; 2 Ves. Jr. 388; and 4 Ves. 431, 432; or of a direction to contract with the governors of a hospital for the purchase of a presentation of a boy to tha charity, if the residuary assets should prove sufficient for that purpose, and they proved to be insufficient. *Cherry* v. *Mott*, 1 Myl. & Cr. 123.

In *Marsh* v. *Means*, 3 Jur. (N. S.) 790, the testator gave a legacy, after the death of his wife, "for continuing the periodical published under the title of ' The Voice of Humanity,' according to the objects and principles which are set forth in the prospectus contained in the third number of that publication." " The Voice of Humanity" had been published quarterly by an association for the protection of animals, but no number had appeared for nearly a year before the date of the will. Upon the death of the widow twenty years later, Vice Chancellor Wood held that the gift was not to support the principles of the publication, but only the publication itself, and, the publication having ceased and the association perished, that the legacy lapsed. But he added, " It would, I think, have fallen within the description of charity, if this periodical had been subsisting at the date of the will, and afterwards ceased. That would be simply a case where, the particular intention having failed, the general intention must be carried out."

Two striking cases upon this subject have arisen in England under charities for the redemption of captives.

In the case of *Betton's Charity*, Thomas Betton in 1723 bequeathed the residue of his estate to the Ironmongers' Company, in trust, " positively forbidding them to diminish the capital sum by giving away any part, or that the interest and profit arising

be applied to any other use or uses than hereinafter mentioned and directed," namely, one half of the income yearly unto the redemption of British slaves in Turkey or Barbary, one fourth unto charity schools in the city and suburbs of London where the education is according to the church of England, and one fourth " unto necessitated decayed freemen of the company, their widows and children." The first half of the income of the fund greatly accumulated, few such slaves having been found for a century. Lord Brougham, reversing the decree of Sir John Leach, M. R., held that the court had jurisdiction to apply the surplus income of this moiety and its accumulations as near as might be to the intentions of the testator; having regard to the bequest touching British captives, and also to the other charitable bequests in the will; and that the case should be referred back to the master to approve a proper scheme for such application. *Attorney General* v. *Ironmongers' Company*, 2 Myl. & K. 576. Sir Christopher Pepys, M. R. (afterwards Lord Cottenham,) accordingly ordered it to be so referred. On the return of the master's report, Lord Langdale, M. R., approved a scheme to apply the whole fund to the second and third purposes declared in the will. 2 Beav. 313. Lord Chancellor Cottenham on appeal reversed this decree; and upon the ground that the testator had not limited the first charity, like the others, to persons in London, ordered the first moiety to be applied to supporting and assisting charity schools in England and Wales, and referred it back to the master to settle a scheme for that purpose. Cr. & Phil. 208. And this decree was affirmed in the house of lords with the concurrence of Lord Chancellor Lyndhurst, and Lords Brougham, Cottenham and Campbell. 10 Cl. & Fin. 908. In that case, though there were differences of opinion as to the details of the scheme, the jurisdiction of the court of chancery to frame one in such a case was thus affirmed by the deliberate judgments of five law lords; and all agreed that, for the purpose of ascertaining what was *cy pres* to the particular object which had failed, the court might look at all the charitable bequests in the will; applying in this respect the principle upon which Lord Bacon had acted more than two centuries before in the case of *Bloomfield* v. *Stowemarket*, above cited.

But the case most like that now before us is that of *Lady Mico's Charity.* Lady Mico, by her will made in 1670, gave a thousand pounds " to redeem poor slaves in what manner the executors should think most convenient." This charity was established by decree in chancery in 1686. Upon an information filed in 1827, after the fund had accumulated a hundred fold, it was referred to a master to approve of a scheme for the application of the income according to the will of the testatrix, or, if he should find that it could not be executed according to her will, then as near the intent of the will as could be, regard being had to the existing circumstances and to the amount of the fund. The master, by his general report in 1835, stated that the relators had laid before him a scheme for applying the fund to the enfranchisement of slaves in the British Colonies who were too poor to purchase their own freedom; which application, in consequence of the *St.* of 3 & 4 Will. IV. *c.* 73, abolishing slavery, (which took effect in 1834,) had become impracticable; that he was of opinion that the testatrix by her will contemplated the redemption of poor slaves in the Barbary States, but that intention could not be carried into effect; and he approved a scheme to apply the capital and income in purchasing and building school-houses for the education of the emancipated apprentices and their issue, qualifying teachers, paying the salaries of masters and other expenses, and to apply the surplus rents to the support of any other schools, and generally in promoting education in the British Colonies. Sir Christopher Pepys, M. R., confirmed this scheme by a decree; and, after he had become lord chancellor, stated the reasons to have been that " in this there was no restriction as to the description of slaves, or the countries in which the slaves were to be looked for;" that upon the reference to the master " it appeared that there were not within any part of the British dominions any poor slaves to be redeemed, but that there were in the colonies many thousands of human beings from whom the odious appellation of slaves had been removed, but whose state was very far short of that of freemen, from whose bodies the chains of slavery had been struck, but whose minds and morals were

still in that state of degradation which is inseparable from the unfortunate situation from which they had recently been in part rescued; it was proposed to the master to apply, and he approved of a scheme for the completion of that holy work, by assisting in the education of those poor beings. If, before the Slavery Abolition Act, these funds could properly have been applied to procuring the redemption of slaves in the colonies, the proposed application for the benefit of the apprentices was doubtless *cy pres* to the intention of the donor." And his reason for not applying *Betton's Charity* in the same manner was that it was in terms limited to slaves in Turkey or Barbary. *Attorney General* v. *Gibson,* 2 Beav. 317, *note. Attorney General* v. *Ironmongers' Co.* Cr. & Phil. 226, 227.

There is no adjudication of this question by the supreme court of the United States. The *dicta* of Chief Justice Marshall in *Baptist Association* v. *Hart's Executors,* 4 Wheat. 1, were based upon an imperfect survey of the authorities, were not required by the decision, and are hardly reconcilable with the more recent judgments of the same court; and that case, as well as *Wheeler* v. *Smith,* 9 How. 79, arose under the law of Virginia. 2 How. 192. 24 How. 501. 4 Met. 380. 12 Gray, 593. 2 Kent Com. 287. In *Fontain* v. *Ravenel,* 17 How. 369, the testator authorized his executors or the survivor of them to dispose of the residue of his estate "for the use of such charitable institutions in Pennsylvania and South Carolina, as they or he may deem most beneficial to mankind," and they died without appointing; and it was held that the title did not vest in the executors as trustees, and that according to the English law the disposition would have been in the crown by sign manual. As Mr. Justice McLean, delivering the opinion of the court, said: "Nothing short of the prerogative power, it would seem, can reach this case. There is not only uncertainty in the beneficiaries of this charity, but behind that is a more formidable objection. There is no expressed will of the testator. He intended to speak through his executors or the survivor of them, but by the acts of Providence this has become impossible. It is then as though he had not spoken. Can any power now speak

for him, except the *parens patriæ?*" The further remarks about the power of *cy pres,* if intended to cover a case in which the charitable purposes were described or indicated in the will, were upon a question not before the court. The separate opinion of Chief Justice Taney in *Fontain* v. *Ravenel* was but his own, based mainly upon that of Chief Justice Marshall in *Baptist Association* v. *Hart's Executors.* And it is impossible to avoid the inference that the impressions of both of those eminent magistrates were derived from the laws of Maryland and Virginia in which they had been educated, and by which the *St.* of 43 Eliz. has been expressly repealed, and charities are not recognized as entitled to any favor, either in duration or construction, beyond other trusts. *Dashiell* v. *Attorney General,* 5 Har. & Johns. 392. *Gallego* v. *Attorney General,* 3 Leigh, 450, In North Carolina, the supreme court once declared that it had all the powers exercised by the English chancellor, either in the equity jurisdiction or under the sign manual; and since, rebounding from that extreme opinion, seems to have adopted the view of Maryland and Virginia. *Griffin* v. *Graham,* 1 Hawks, 96. *McAuley* v. *Wilson,* 1 Dev. Eq. 276. *Holland* v. *Peck,* 2 Ired. Eq. 255. There is a *dictum* to a like effect in *Carter* v. *Balfour,* 19 Alab. 830. So in New York, the court of appeals, after some division and vacillation of opinion in the course of the frequent changes in the composition of the court, has recently adjudged that in that state the English law of charitable uses has been wholly abrogated by statute, and that charities are within the rule against perpetuities, and have no privileges above private trusts. *Bascom* v. *Albertson,* 34 N. Y. 584.

On the other hand, the court of appeals of Kentucky, in an able judgment delivered by Chief Justice Robertson, marked the distinction between the power exercised under the sign manual, and that inherent in the equity jurisdiction; and, after speaking of the former as not judicial, added: " The *cy pres* doctrine of England is not, or should not be, a judicial doctrine, except in one kind of case; and that is, where there is an available charity to an identified or ascertainable object, and a particular mode, inadequate, illegal or inappropriate, or which

happens to fail, has been prescribed. In such case, a court of equity may substitute or sanction any other mode that may be lawful and suitable and will effectuate the declared intention of the donor, and not arbitrarily and in the dark, presuming on his weakness or wishes, declare an object for him. A court may act judicially as long as it effectuates the lawful intention of the donor." *Moore* v. *Moore*, 4 Dana, 366. See also *Gass* v. *Wilhite*, 2 Dana, 177; *Curling* v. *Curling*, 8 Dana, 38. The power of cy pres, which was declared by the supreme court of Pennsylvania in *Methodist Church* v. *Remington*, 1 Watts, 226, and *Witman* v. *Lex*, 17 S. & R. 93, not to exist in that state, was the power exercised under the sign manual in case of a gift to superstitious uses, or of an expression of general intention to devote a sum to charitable purposes not designated. In a very recent case, the same court said: " The rule of equity on this subject seems to be clear, that when a definite charity is created, the failure of the particular mode in which it is to be effectuated does not destroy the charity; for equity will substitute another mode, so that the substantial intention shall not depend upon the formal intention." " And this is the doctrine of *cy pres*, so far as it has been expressly adopted by us " — " a reasonable doctrine, by which a well defined charity, or one where the means of definition are given, may be enforced in favor of the general intent, even where the mode or means provided for by the donor fail by reason of their inadequacy or unlawfulness." *Philadelphia* v. *Girard*, 45 Penn. State R. 27, 28. Like principles have been maintained in South Carolina and Illinois. *Attorney General* v. *Jolly*, 1 Rich. Eq. 99; *S. C.* 2 Strob. Eq. 395. *Gilman* v. *Hamilton*, 16 Illinois, 231. The existence of a judicial power to administer a charity *cy pres* where the expressed intention of the founder cannot be exactly carried out has been either countenanced or left an open question in all the New England states except Connecticut. *Burr* v. *Smith*, 7 Verm. 287, 288. *Second Congregational Society* v. *First Congregational Society*, 14 N. H. 330. *Brown* v. *Concord*, 33 N. H. 296. *Derby* v. *Derby*, 4 R. I. 439. *Tappan* v. *Deblois*, 45 Maine, 131. *Howard* v. *American Peace Society*, 49 Maine, 302, 303. *Treat's*

*Appeal*, 30 Conn. 113.   See also 2 Redfield on Wills, 815, *note ,*
*McCord* v. *Ochiltree*, 8 Blackf. 15; *Beall* v. *Fox*, 4 Georgia,
427; *Chambers* v. *St. Louis*, 29 Missouri, 590, 592; *Lepage* v.
*Macnamara*, 5 Iowa, 146; *McIntyrc* v. *Zanesville*, 17 Ohio State
R. 352.

The narrow doctrines which have prevailed in some states
upon this subject are inconsistent with the established law of
this commonwealth.   Our ancestors brought with them from
England the elements of the law of charitable uses, and, although
the form of proceeding by commission under the *St.* of 43 Eliz.
has never prevailed in Massachusetts, that statute, in substance
and principle, has always been considered as part of our common
law.   4 Dane Ab. 6, 239.   *Earle* v. *Wood*, 8 Cush. 445.   Under the
Colony charter, charities were regulated and administered, accord-
ing to the intent of the donors, under the direction of the gen-
eral court, the court of assistants, and the county courts; and
under the Province charter, although no court was vested with
equity jurisdiction, charitable bequests were not the less valid.
Anc. Chart. 52.   *Drury* v. *Natick*, 10 Allen, 180, 181, and au-
thorities cited.   *Winslow* v. *Trowbridge*, stated in 11 Allen,
459, 460.   The English Mortmain Act of 9 Geo. II. *c.* 36,
did not extend to Massachusetts; and the similar provision in
the Prov. St. of 28 Geo. II. *c.* 9, was repealed immediately after
our Revolution by *St.* 1785, *c.* 51.   *Odell* v. *Odell*, 10 Allen, 6.
Charities are held not to be within the common rule limiting
perpetuities and accumulations.   *Dexter* v. *Gardner*, 7 Allen,
243.   *Odell* v. *Odell*, 10 Allen, 1.   Charitable bequests to an
unincorporated society here, to a foreign corporation or society,
or to a particular religious denomination in a certain county,
have been carried into effect, even where no trustees have been
named in the will.   *Burbank* v. *Whitney*, 24 Pick. 146.   *Bartlett*
v. *Nye*, 4 Met. 378.   *Washburn* v. *Sewall*, 9 Met. 280.   *Universal-*
*ist Society* v. *Fitch*, 8 Gray, 421.   See also *Wells* v. *Doane*, 3
Gray, 201; *Saltonstall* v. *Sanders*, 11 Allen, 446.

The intention of the testator is the guide, or, in the phrase
of Lord Coke, the lodestone, of the court; and therefore, when-
ever a charitable gift can be administered according to his

express directions, this court, like the court of chancery in England, is not at liberty to modify it upon considerations of policy or convenience. *Harvard College* v. *Society for Promoting Theological Education,* 3 Gray, 280. *Baker* v. *Smith,* 13 Met. 34. *Trustees of Smith Charities* v. *Northampton,* 10 Allen, 498. But there are several cases, where the charitable trust could not be executed as directed in the will, in which the testator's scheme has been varied by this court in such a way and to such an extent as could not be done in the case of a private trust. Thus bequests to a particular bible society by name, whether a corporation established by law or a voluntary association, which had ceased to exist before the death of the testator, have been sustained, and applied to the distribution of bibles through a trustee appointed by the court for the purpose. *Winslow* v. *Cummings,* 3 Cush. 358. *Bliss* v. *American Bible Society,* 2 Allen, 334. At a time when the general chancery jurisdiction of this court over trusts was limited to those arising under deeds and wills, the legislature by a special statute authorized it to hear and determine in equity any and all matters relating to a certain gift to a scientific corporation, to be invested in a certain manner, and paid in premiums for discoveries or improvements on heat or light published in America within two years before each award. Upon a bill being filed, and it appearing that it had become impracticable to carry out the intent of the donor in the mode prescribed; Chief Justice Shaw authorized a different investment of the fund; and, in accordance with a scheme reported by a master, authorized the corporation to apply the surplus income, after paying such premiums, to purchasing books, papers and philosophical apparatus, and making such publications or procuring such lectures, experiments or investigations as should facilitate and encourage the making of such discoveries and improvements; and said: " Whenever it appears that a general object of charity is intended, and the purpose is not unlawful and void, the right of the heir at law is divested." It is now a settled rule in equity that a liberal construction is to be given to charitable donations, with a view to promote and accomplish the general charitable intent of the donor, and that

such intent ought to be observed, and when this cannot be strictly and literally done, this court will cause it to be fulfilled as nearly in conformity with the intent of the donor as practicable. Where the property thus given is given to trustees capable of taking, but the property cannot be applied precisely in the mode directed, the court of chancery interferes, and regulates the disposition of such property under its general jurisdiction on the subject of trusts, and not as administering a branch of the prerogative of the king as *parens patriæ.*" " What is the nearest method of carrying into effect the general intent of the donor must of course depend upon the subject matter, the expressed intent, and the other circumstances of each particular case, upon all which the court is to exercise its discretion." *American Academy* v. *Harvard College,* 12 Gray, 582. The same principle was also recognized or assumed in 4 Dane Ab. 242, 243, in *Sanderson* v. *White,* 18 Pick. 333, and other cases already cited. 13 Met. 41. 3 Gray, 282, 298. 10 Allen, 501, 502.

By the Gen. Sts. *c.* 113, § 2, this court may hear and determine in equity all suits and proceedings for enforcing and regulating the execution of trusts, whether the trusts relate to real or personal estate, " and shall have full equity jurisdiction, according to the usage and practice of courts of equity, in all other cases, where there is not a plain, adequate and complete remedy at law." The powers usually exercised by the court of chancery in the course of its jurisdiction in equity have thus been expressly conferred upon this court by the legislature. The authority of administering a charitable trust according to the expressed intention of the donor, and, when that cannot be exactly followed, then as nearly as possible, is a part of this jurisdiction, which the court is not at liberty to decline. The only question is, whether the facts of the case show a proper occasion for its exercise according to the settled practice in chancery.

In all the cases cited at the argument, in which a charitable bequest, which might have been lawfully carried out under the circumstances existing at the death of the testator, has been held, upon a change of circumstances, to result to the heirs at law or

residuary legatees, the gift was distinctly limited to particular persons or establishments. Such was *Russell* v. *Kellett*, 3 Sm. & Giff. 264, in which the gift was of five pounds outright to each poor person of a particular description in certain parishes, and Vice Chancellor Stuart held that the shares of those who died before receiving them went to the residuary legatees. Such also was *Clark* v. *Taylor*, 1 Drewry, 642, in which it was held that a legacy to a certain orphan school by name, which ceased to exist after the death of the testator, failed and fell into the residue of the estate; and which can hardly be reconciled with the decisions in *Incorporated Society* v. *Price*, 1 Jones & Lat. 498; *S. C.* 7 Irish Eq. 260; *In re Clergy Society*, 2 Kay & Johns. 615; *Marsh* v. *Attorney General*, 2 Johns. & Hem. 61; *Winslow* v. *Cummings*, 3 Cush. 358, and *Bliss* v. *American Bible Society*, 2 Allen, 334. So in *Easterbrooks* v. *Tillinghast*, 5 Gray, 17, the trust was expressly limited, not only in object, but in duration, to the maintenance of the pastor of a certain church of a specified faith and practice in a particular town, " so long as they or their successors shall maintain the visibility of a church in said faith and order;" and could not have been held to have terminated, had it not been so limited. *Attorney General* v. *Columbine*, Boyle on Charities, 204, 205. *Potter* v. *Thurston*, 7 R. I. 25. *Dexter* v. *Gardner*, 7 Allen, 243.

The charitable bequests of Francis Jackson cannot, in the opinion of the court, be regarded as so restricted in their objects, or so limited in point of time, as to have been terminated and destroyed by the abolition of slavery in the United States. They are to a board of trustees for whose continuance careful provision is made in the will, and which the testator expresses a wish may become a permanent organization and may receive the services and sympathy, the donations and bequests, of the friends of the slave. Their duration is not in terms limited, like that of the trust sought to be established in the sixth article of the will by the accomplishment of the end specified. They take effect from the time of the testator's death, and might then have been lawfully applied in exact conformity with his expressed intentions. The retaining of the funds in the custody of the court while this

case has been under advisement cannot affect the question. The gifts being lawful and charitable, and having once vested, the subsequent change of circumstances before the funds have been actually paid over is of no more weight than if they had been paid to the trustees and been administered by them for a century before slavery was extinguished.

Neither the immediate purpose of the testator — the moral education of the people ; nor his ultimate object — to better the condition of the African race in this country ; has been fully accomplished by the abolition of slavery.

Negro slavery was recognized by our law as an infraction of the rights inseparable from human nature ; and tended to promote idleness, selfishness and tyranny in one part of the community, a destruction of the domestic relations and utter debasement in the other part. The sentiment which would put an end to it is the sentiment of justice, humanity and charity, based upon moral duty, inspired by the most familiar precepts of the Christian religion, and approved by the Constitution of the Commonwealth. The teaching and diffusion of such a sentiment are not of temporary benefit or necessity, but of perpetual obligation. Slavery may be abolished ; but to strengthen and confirm the sentiment which opposed it will continue to be useful and desirable so long as selfishness, cruelty, the lust of dominion, and indifference to the rights of the weak, the poor and the ignorant, have a place in the hearts of men. Looking at the trust established by the fourth article of this will as one for the moral education of the people only, the case is within the principle of those, already cited, in which charities for the relief of leprosy and the plague were held not to end with the disappearance of those diseases ; and is not essentially different from that of *Baliol College*, in which a trust for the education at Oxford of Scotch youths, to be sent into Scotland to preach Episcopalianism in the established church there, was applied by Lords Somers and Hardwicke and their successors to educate such youths, although, by the change of faith and practice of the Church of Scotland, the donor's ultimate object could no longer be accomplished.

The intention of Francis Jackson to benefit the negro race appears not only in the leading clause of the fourth article, and in his expression of a hope that his trustees might receive the aid and the gifts of the friends of the slave, but in the trust for the benefit of fugitive slaves in the fifth article of the will, to which, according to the principle established by the house of lords in the case of *Betton's Charity*, resort may be had to ascertain his intent and the fittest mode of carrying it out. The negroes, although emancipated, still stand in great need of assistance and education. Charities for the relief of the poor have been often held to be well applied to educate them and their children. *Bishop of Hereford* v. *Adams*, 7 Ves. 324. *Wilkinson* v. *Malin*, 2 Cr. & Jerv. 636; *S. C.* 2 Tyrwh. 544. *Anderson* v. *Wrights of Glasgow*, 12 Law Times, (N. S.) 807. The case of the *Mico Charity* is directly to the point that a gift for the redemption of poor slaves may be appropriated, after they have been emancipated by law, to educate them; and the reasons given by Lord Cottenham for that decision apply with no less force to those set free by the recent amendment of the Constitution in the United States, than to those who were emancipated by act of parliament in the West Indies.

The mode in which the funds bequeathed by the fourth and fifth articles of the will may be best applied to carry out in a lawful manner the charitable intents and purposes of the testator as nearly as possible must be settled by a scheme to be framed by a master and confirmed by the court before the funds are paid over to the trustees. In doing this, the court does not take the charity out of the hands of the trustees, but only declares the law which must be their guide in its administration. Shelford on Mortmain, 651–654. Boyle on Charities, 214–218. The case is therefore to be referred to a master, with liberty to the attorney general and the trustees to submit schemes for his approval; and all further directions are reserved until the coming in of his report. *Case referred to a master.*

The case was then referred to John Codman, Esquire, a master in chancery for this county, who, after notice to the trustees and

the attorney general, and hearing the parties, made his report, the results of which were approved by the attorney general; and upon exceptions to which the case was argued by *W. Phillips* for himself and other excepting trustees, and by *J. A. Andrew* in support of the master's report, before *Gray*, J. with the agreement that he should consult the whole court before entering a final decree. No account was asked by any party of sums already expended by the trustees.

As to the bequest in the fifth article, the master reported that the unexpended balance (amounting to $1049.90) was so small that it was reasonable that it should be confined to a limited territory; and that it should therefore be applied by the trustees, in accordance with their unanimous recommendation, to the use of necessitous persons of African descent in the city of Boston and its vicinity. This scheme was approved and confirmed by the court, with this addition: " Preference being given to such as have escaped from slavery."

As to the sum bequeathed in the fourth article of the will, the master reported that a portion had been expended by the trustees before any question arose as to its validity; and that but two schemes had been suggested to him for the appropriation of the residue, namely, first, (which was approved by four of the seven trustees who had accepted the trust,) in part to the support of the Anti-Slavery Standard, and in part to the New England Branch of the American Freedmen's Union Commission ; or, second, (which was approved by the remaining trustees,) that the whole should be applied to the last named object.

The master disapproved of the first of these schemes ; and eported that the Anti-Slavery Standard was a weekly newspaper published in the city of New York with a circulation of not more than three thousand copies, which was established nearly thirty years ago for the purpose of acting upon public opinion in favor of the abolition of slavery ; that in his opinion, since the abolition of slavery, and the passage of the reconstruction acts of congress, " the support of a paper of such limited circulation as hardly to be self-sustaining would do very little for the benefit of the colored people in their present *status*, and its

direct influence would be almost imperceptible on the welfare of that class most nearly corresponding to those whom the testator had in view in making this bequest;" and that the argument, that it was evidently the intention of the testator to accomplish the object indicated in the fourth article of his will by means of which a newspaper like this might be considered an example, was answered by the fact that the object for which these means were to be used had been already accomplished without them. The master returned with his report a few numbers of the Anti-Slavery Standard, (taken without selection as they were given to him by the chairman of the trustees,) by which it appeared that it was in large part devoted to urging the passage of laws securing to the freedmen equal political rights with the whites, the keeping of the southern states under military government, the impeachment of the president, and other political measures.

The master reported that he was unable to devise any better plan than the second scheme suggested; that this mode of appropriation was in his opinion most in accordance with the intention of the testator as expressed in the fourth article of the will, because the intention nearest to that of emancipating the slaves was by educating the emancipated slaves to render them capable of self-government, and this could best be done by an organized society, expressly intended and exactly fitted for this function, and which, if the whole or any part of this fund was to be applied to the direct education and support of the freedmen, was admitted at the hearing before him to be the fittest channel for the appropriation. The master returned with his report printed documents by which it appeared that the object of the American Freedmen's Union Commission, as stated in its constitution, was " the relief, education and elevation of the freedmen of the United States, and to aid and coöperate with the people of the south, without distinction of race or color, in the improvement of their condition, upon the basis of industry, education, freedom and Christian morality;" and that the New England and other branches of the commission were now maintaining large numbers of teachers and schools for this purpose throughout the southern states.

The master accordingly reported that what remained of the fund bequeathed by the fourth article of the will should be "ordered to be paid over to the New England Branch of the Freedmen's Union Commission, to be employed and expended by them in promoting the education, support and interests generally of the freedmen (late slaves) in the States of this Union recently in rebellion." And this scheme was by the opinion of the whole court accepted and confirmed, modified only by directing the executor to pay the fund to the trustees, to be by them paid over at such times and in such sums as they in their discretion might think fit to the treasurer of the branch commission; and by substituting for the words "recently in rebellion" the words "in which slavery has been abolished, either by the proclamation of the late President Lincoln or the amendment of the Constitution."            *Final decree accordingly.*